Filed 10/9/13  Online Carstereo.com v. Behrooz Meimand Ins. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ONLINE CARSTEREO.COM, | B243365 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC455183) |
| v. | |
| BEHROOZ MEIMAND INSURANCE SERVICES, INC., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Amy D. Hogue, Judge.  Affirmed.

Musick, Peeler & Garrett, David A. Tartaglio, Cheryl A. Orr; Collins Collins Muir + Stewart, David E. Barker and Ryan J. Kohler for Defendant and Appellant.

Carlsen Law Corporation and Miles Carlsen for Plaintiff and Respondent.

_____

An insured sued its insurance broker for breach of an oral or implied contract, claiming that the broker failed to use reasonable efforts to procure insurance with theft coverage. The jury found in favor of the insured. The broker appeals, contending there was a lack of substantial evidence to support the elements of a contract, the broker was prejudicially precluded from introducing expert testimony, and there was prejudicial instructional error. We find the broker has forfeited the substantial evidence issue by failing to present all the material evidence in its opening brief. We also find the other two contentions without merit. We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

**The Parties' 12-Year History**

The insured, plaintiff and respondent Online Carstereo.com (OCS), sells car stereo systems over the Internet. OCS's main inventory is car stereos, which are stored in a 10,000 square-foot warehouse in Vernon, California. From 1998 through 2010, OCS's insurance broker for obtaining property insurance was defendant and appellant Behrooz Meimand Insurance Services, Inc. (BMIS). During this 12-year period OCS's principal, Rami Ettlinger (Ettlinger), spoke annually with BMIS's principal, Behrooz Meimand (Meimand), about OCS and its insurance needs. Meimand testified that he understood OCS's most valuable asset was its inventory, and that every year through 2009 he procured property coverage for OCS that included theft overage. Ettlinger never attempted to arrange insurance coverage for OCS by himself; instead he relied on and "trusted" Meimand for OCS's insurance needs.

Between 1998 and 2009, BMIS's custom and practice was to alert OCS about any changes in coverage. For example, Meimand testified that BMIS's July 2007 insurance proposal for OCS used bold and capitalized font to alert OCS about exclusions in the upcoming policy. Ettlinger testified that if there was ever any modification or exclusion in coverage, BMIS would highlight the information by using bold or underlined font, and would asked Ettlinger to "sign on every single page of everything that makes a difference." Ettlinger relied on these disclosures over the years.

2

OCS paid its premiums in full every year between 1998 and 2010 and BMIS in turn received its annual commissions as compensation for its services.

**OneBeacon Policy, Theft, and Cancellation**

In 2009, BMIS procured an insurance policy from OneBeacon Insurance Companies (OneBeacon) for OCS for the policy period of September 1, 2009, through September 1, 2010. The OneBeacon policy, like each of OCS's preceding polices, provided theft coverage for OCS's inventory.

In April 2010, OCS suffered a theft loss when burglars broke into its warehouse and stole inventory. OneBeacon paid OCS $650,000 on its theft loss claim.

On June 17, 2010, OneBeacon informed OCS that it was not going to renew OCS's policy for the September 1, 2010, through September 1, 2011, period because it was no longer "providing a market for non-specialty Commercial Lines Business."

Ettlinger testified that the same day he received the nonrenewal notice, he contacted Meimand "to start right away looking for replacement insurance for me with theft," and conveyed that the issue was urgent. By e-mail dated June 22, 2010, Meimand asked Ettlinger for information about OCS's updated alarm system, which Ettlinger provided the same day. Meimand testified that he asked for the information because he knew that Ettlinger wanted theft coverage. Meimand also testified that it was his understanding that as of June 22, 2010, Ettlinger was requesting that BMIS find a policy to replace the OneBeacon policy and that Ettlinger was "somewhat anxious about getting the process started to search for the policy." BMIS did not start its search for a replacement policy until more than a month later.

**Search Efforts**

Although BMIS stated in verified interrogatory responses, signed by Meimand, that it had contacted 10 insurers and intermediaries about obtaining theft coverage for OCS and that each declined to sell theft coverage to OCS based on the April 2010 theft, Meimand admitted at trial that these responses were untrue. BMIS only made four or five contacts.

On August 3, 2010, BMIS's Val Tierney (Tierney) contacted Bass Underwriters (Bass), a surplus lines broker, about obtaining a replacement policy for OCS. Tierney prepared an application for insurance to be used in the search. While BMIS produced one version of the application at trial, OCS produced other versions that had previously been attached by BMIS as "true and correct" copies to the declarations of Tierney and Meimand. Each version of the application contained incorrect information, including that OCS had only been in business three years instead of 12 years; that it had gross sales of $758,000 instead of $8 million; that it sought $1.2 million in business personal property instead of $2 million; and that no crimes had occurred on its premises within the previous three years.

On August 4, 2010, Bass was in contact with Landmark American Insurance Company (Landmark) about a policy for OCS, even though Landmark did not sell theft coverage for businesses selling car stereo systems, regardless of any prior loss history.

On August 6, 2010, Tierney sent an e-mail to "Travelers" stating, "Apparently [OCS] is 100 [percent] online. [¶] So this is dead to you guys." Travelers responded the same day stating, "Correct, we will have to decline due to the internet sales." There was no mention of the April 2010 theft loss.

Likewise, on August 6, 2010, Tierney contacted "Allied," which was "not able to write online stores only." Again, there was no mention of theft loss.

BMIS also contacted Burns & Wilcox, which responded that "they are not competitive."

Contrary to BMIS's position, American E&S Insurance Brokers (AES) never represented in August 2010 that it could not find an insurer willing to sell theft insurance to OCS. Indeed, on August 11, 2010, AES asked for information on OCS's alarm system and the April 2010 loss. BMIS did not respond with the information, despite having obtained it from OCS on June 22, 2010.

Tierney disregarded another inquiry for this same information from another intermediary, Network Insurance Associates (Network), made on August 17, 2010.

**Communications Between the Parties During June 23–August 9, 2010**

After June 23, 2010, Ettlinger did not hear from anyone at BMIS for more than a month. On July 30, 2010, he sent an e-mail to Meimand requesting an update. Meimand did not respond, so Ettlinger sent him another e-mail on August 4, 2010. Meimand replied that day stating, "We got it & we are working for that renewal with different carriers. [¶] You will hear from us soon. [¶] We don't leave you without coverage." Ettlinger testified that he understood this to mean that BMIS was getting a replacement policy with theft coverage.

Ettlinger testified that prior to August 9, 2010, he never had any discussions with anyone at BMIS about Landmark. Meimand admitted that BMIS did not inform OCS between August 4 and August 8, 2010, that Landmark would not provide theft coverage to a business that sold car stereos.

On August 9, 2010, BMIS faxed OCS a proposal for insurance from Landmark. The proposal did not state that the Landmark policy excluded theft coverage. Meimand testified that this was an "oversight." Tierney testified that he prepared the proposal. When asked why the proposal did not state that theft was excluded, Tierney replied, "I don't really have a good answer for that."

Ettlinger read the proposal the same day he received it. He testified that "we never even discussed if theft is included or not. Theft was always included." When he saw that the business personal property limit was $1.2 million, he immediately contacted Meimand and requested that BMIS get higher coverage similar to the OneBeacon policy. Meimand e-mailed that BMIS was working on revising the limit. Meimand gave no consideration to stating in the e-mail that the Landmark policy did not provide theft coverage.

On August 11, 2010, BMIS faxed OCS another proposal with a business personal property limit of $2 million. While the two proposals looked identical, the third page of the second proposal included the words "Theft Excluded" in the same font as the rest of the page without any highlighting or emphasis. There were "X"s on the pages BMIS wanted Ettlinger to sign. The page stating "Theft Excluded" did not contain an "X," even

though Meimand testified he was aware that theft coverage was of "paramount importance" to OCS. Ettlinger did not see this exclusion.

**Landmark Policy and Binder**

BMIS arranged the Landmark policy for OCS on August 11, 2010. BMIS did not take any steps after that date to secure a policy with theft coverage, even though the OneBeacon policy was not set to expire until September 1, 2010, and AES and Network were asking for information about OCS's updated alarm system.

On or about August 18, 2010, BMIS received an insurance binder from Bass for the Landmark policy. The binder stated on the first page that theft was excluded. Instead of sending OCS this binder, BMIS prepared a different binder, which it sent to OCS on September 3, 2010. The binder sent to OCS said nothing about theft being excluded.

While Meimand testified that BMIS "always" mailed its clients hard copies of their insurance policies, BMIS did not send a hard copy of the Landmark policy to OCS. Instead, BMIS e-mailed the policy on September 14, 2010, two weeks after OCS requested a copy. Ettlinger did not open the e-mail and believed the policy contained theft coverage.

**Second Theft**

On January 30, 2011, a Sunday, burglars broke into OCS's Vernon warehouse and stole inventory. Ettlinger contacted Meimand the next day to start the claim process. Meimand stated that he would check the file and call back within an hour. When Ettlinger did not hear from Meimand, he called Meimand again, who stated, "Rami, we have a problem. You don't have theft insurance." Ettlinger testified that he felt like he was about to have a heart attack and "freaked out." Meimand said he would fax to Ettlinger "the stuff" Ettlinger had signed in August 2010 to show that BMIS had disclosed the theft exclusion. Included in the fax was a document entitled Acord Property Section (APS) dated July 30, 2010, stating "All perils excluding theft." Ettlinger testified that he never received the APS in August 2010 and saw it for the first time on January 31, 2011. Meimand ultimately admitted that BMIS never sent the APS to OCS in August 2010.

6

**The Lawsuit**

OCS sued BMIS for negligence, negligent misrepresentation and breach of oral or implied contract. The trial court dismissed the negligent misrepresentation claim pursuant to BMIS's motion for summary adjudication. Before trial, OCS dismissed its negligence claim, and the trial court ruled there would be no expert testimony. The case proceeded to trial on the sole claim for breach of an oral or implied contract to use reasonable efforts to find theft coverage. The jury unanimously found that OCS and BMIS entered into an oral and implied contract, and that BMIS failed to use reasonable efforts to obtain theft coverage. The jury awarded OCS $275,000 in damages. The trial court entered judgment accordingly. BMIS filed a motion for judgment notwithstanding the verdict and a motion for a new trial. The trial court denied both motions. This appeal follows.

## DISCUSSION

### I. Forfeiture of Substantial Evidence Challenge

"'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.'" (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) "If this 'substantial' evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld. As a general rule, therefore, we will look only at the evidence and reasonable inferences supporting the successful party, and disregard the contrary showing." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.)

When an appellant challenges the sufficiency of the evidence, the opening brief must set forth "*all* the material evidence on the point" and not merely state facts favorable to the appellant. (*Stewart v. Union Carbide Corp*. (2010) 190 Cal.App.4th 23, 34.) An appellant fails to meet this requirement when it "cites the evidence in its favor, points out the ways in which (it contends) it controverted or impeached [the other party's] evidence, and interprets the evidence in the light most favorable to itself." (*Id*. at p. 34.)

7

An appellant must present a "fair summary" of all the evidence and "'cannot shift this burden onto respondent,'" nor can it require the reviewing court to "'undertake an independent examination of the record.'" (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409–410.) When an appellant fails to set forth all of the material evidence, the claim of insufficient evidence is waived or forfeited. (*Arechiga v. Dolores Press, Inc.* (2011) 192 Cal.App.4th 567, 571–572; *Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 749, fn. 1; *Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218.)

The statement of facts set forth above is largely taken from respondent's brief and our own review of the record, rather than from BMIS's opening brief. While BMIS does cite to some evidence favorable to OCS, its opening brief presents an incomplete record of the evidence. Contrary to BMIS's assertion, the evidence in this case was often in conflict. But BMIS fails to fully and fairly discuss the conflicting evidence presented by OCS. It is our opinion that BMIS has failed to meet its appellate burden of setting forth *all* the material evidence in its opening brief necessary for us to evaluate whether substantial evidence supported the elements of OCS's claim for breach of contract. We therefore find that BMIS has forfeited its substantial evidence challenge.

## II. Alternatively, Substantial Evidence Supports the Verdict

### A. Formation of Contract

Civil Code section 1621 defines an implied contract as "one, the existence and terms of which are manifested by conduct." While an implied in fact contract may be inferred from the conduct, situation or mutual relation of the parties, the very heart of this kind of agreement is an intent to promise. (*Division of Labor Law Enforcement v. Transpacific Transportation Co.* (1977) 69 Cal.App.3d 268, 275.) "Whether or not an implied contract has been created is determined by the act and conduct of the parties and all the surrounding circumstances involved and is a question of fact." (*Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 611.)

Relying on *Hanley v. Marsh & McLennan. ETC., Ltd.* (1941) 46 Cal.App.2d 787, 795–796, BMIS argues that OCS merely made a "call for an offer" of insurance, and that

8

no contract was formed until OCS signed the insurance proposal presented by BMIS. But this argument ignores the evidence presented. OCS and BMIS had a 12-year history in which BMIS annually secured property insurance for OCS that always included theft coverage. While OCS could have used brokers other than BMIS, it never did. Ettlinger testified that he relied on and "trusted" Meimand for OCS's insurance needs. Meimand admitted at trial that he understood how important theft coverage was for OCS. Immediately upon receiving notice from OneBeacon of the policy cancellation, Ettlinger asked Meimand to start looking right away for "replacement insurance." Meimand responded, "We don't leave you without coverage." Ettlinger testified that he understood this to mean that BMIS was getting a replacement policy with theft coverage.

There was substantial evidence to support the jury's finding that an implied contract was formed.

### B. Consideration

BMIS argues there was no consideration to support the contract. But Meimand acknowledged that it received a commission every year from OCS, and the evidence showed that it received a commission for the Landmark policy. This is sufficient consideration. (See Civ. Code, § 1605 ["Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise"].)

### C. Causation

BMIS argues the element of proximate causation was not met because OCS presented no evidence that BMIS would have been able to secure theft coverage before the September 1, 2010, expiration of the OneBeacon policy even using reasonable efforts.

As stated in *US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 909: "The test for causation in a breach of contract (or promissory estoppel) action is whether the breach was a substantial factor in causing the damages. [Citation.] 'Causation of damages in contract cases, as in tort cases, requires that the damages be

9

proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain.' [Citation.] A proximate cause of loss or damage is something that is a substantial factor in bringing about that loss or damage. [Citations.] The term 'substantial factor' has no precise definition, but 'it seems to be something which is more than a slight, trivial, negligible, or theoretical factor in producing a particular result.' [Citation.]"

There was substantial evidence that BMIS failed to use reasonable efforts to obtain theft coverage, and that this was a substantial factor in causing OCS's damages. While OCS requested BMIS to secure "replacement policy" on June 22, 2010, BMIS waited until July 30, 2010, to begin its search, and only appears to have started then as a result of Ettlinger's call asking for an update. BMIS contacted approximately five entities. The employee handling the task, Tierney, not only made numerous mistakes in the applications for insurance, but he did not follow up on certain requests from potential insurers. There was evidence that at least two wholesale brokers were asking BMIS about OCS's updated alarm system even after OCS had purchased the Landmark policy excluding theft coverage. These inquiries support the inference that there was some potential for obtaining theft coverage despite OCS's history of theft. But BMIS failed to explore these possibilities. Additionally, the first proposal BMIS sent to OCS said nothing about theft coverage being excluded, nor did the insurance binder BMIS sent to OCS. While it was BMIS's custom and practice to highlight changes in coverage, as it had done for OCS in the past, BMIS did not do so with the Landmark policy. BMIS did not ask Ettlinger to sign the third page of the second proposal excluding theft coverage. Nor did the cover letter for the binder say anything about theft being excluded. While Meimand claimed he told Ettlinger there was no theft coverage in the Landmark policy, Ettlinger testified that they never discussed theft being excluded, and that he practically had a heart attack when he found out after the second burglary that there was no theft coverage. The jury was entitled to credit Ettlinger's testimony over Meimand's.

Furthermore, Meimand testified that it never occurred to him to tell Ettlinger that Landmark did not provide theft coverage for a business selling car stereos. Had

10

Meimand informed Ettlinger that BMIS was having difficulty obtaining theft coverage, OCS could have taken other steps to secure its inventory against theft, such as consulting other brokers, finding another location for its warehouse, or contracting with a third party security patrol service that provided independent insurance against losses for a failure of security.

The trial court was not persuaded that to establish causation OCS had to prove that BMIS, using reasonable efforts, would have obtained a policy that included theft coverage. Neither are we. This was not a professional negligence case, but a breach of implied contract case. As CACI No. 350 states, "To recover damages for any harm, [a plaintiff] must prove that when the contract was made, both parties knew or could reasonably have foreseen that the harm was likely to occur in the ordinary course of events as result of the breach of the contract." BMIS knew that OCS's inventory was vulnerable to harm, that OCS directed BMIS to obtain a policy with theft coverage, and that an uninsured theft loss was reasonably foreseeable. In any event, BMIS's counsel told the jury in his opening statement that BMIS contacted multiple insurers and intermediaries and none were willing to sell theft coverage to OCS due to its prior theft loss. Meimand testified that BMIS had seven sources for a company "like" OCS and none were willing to offer theft insurance to OCS. Tierney also testified that he could not find any insurer willing to provide theft coverage to OCS. The jury clearly disregarded this testimony, which was contradicted by the evidence that at least two brokers were asking for OCS's security information after OCS purchased the Landmark policy.

## III. Expert Testimony

BMIS contends that the trial court committed prejudicial error by precluding BMIS from presenting expert testimony on the issue of what constitutes "reasonable efforts" by an insurance broker. We agree with the trial court that BMIS did not suffer prejudice.

BMIS asserts that its expert, who was designated before OCS dismissed its professional negligence claim, was prepared to discuss a variety of subjects, including the standard of care of an insurance broker and the availability of theft coverage for OCS.

11

While the expert was prepared to state that the surplus lines brokers could not find a market with theft coverage, the trial court properly found that "[t]he factual underpinnings for the proffered testimony—that all of the surplus lines [brokers] told Meimand that they could not find coverage—are not supported by evidence." Indeed, the jury heard that at least two brokers were asking for information about OCS's alarm system, even after the Landmark policy was purchased.

Contrary to BMIS's argument that it "was entirely deprived of the right" to offer testimony that it acted reasonably and did not breach its standard of care in applying for replacement coverage, Meimand and Tierney testified about the steps they took and that they were told no one would offer theft insurance to OCS. Thus, the expert's testimony on this issue would not have assisted the jury.

In any event, the standard of care was not an issue in this breach of contract case. Even if it was, the proffered expert testimony did not include an opinion that all of BMIS's omissions and errors fell within the standard of care or were reasonable. As the trial court noted, "Significantly, [BMIS] offers no proposed expert testimony that an insurance agent who fails to alert its client to a material change in the re-submission of a corrected proposal for coverage uses reasonable efforts on the client's behalf."

The evidence presented to the jury of BMIS's conduct was the type of evidence that could be easily understood by the jury. It does not take an expert to point out that a broker's failure to explicitly emphasize to a client the fact that an insurance proposal did not include theft coverage when the client had asked for such coverage, and thought it had such coverage, could ultimately harm the client. The jury simply did not need expert testimony to decide that, given the parties' 12-year course of dealing, BMIS did not use reasonable efforts in 2010 to procure "replacement" theft coverage.

## IV. Instructional Error

Finally, BMIS contends that the trial court committed prejudicial error in instructing the jury with one of the court's own instructions.

We review the propriety of a jury instruction de novo. Our task is to determine whether the trial court fully and fairly instructed on the applicable law. (*People v.*

12

*Franco* (2009) 180 Cal.App.4th 713, 720.)  We look to the instructions as a whole and the entire record of trial, including the arguments of counsel.  (*Ibid*.)  "We assume that the jurors are ""'"intelligent persons and capable of understanding and *correlating* all jury instructions . . . given.""'"  If reasonably possible, we will interpret the instructions to support the judgment rather than to defeat it."  (*Id*. at p. 720.)  When deciding whether an erroneous instruction was prejudicial, we evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled.  (*Soule v. General Motors Corp*. (1994) 8 Cal.4th 548, 580–581.)  "Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.'"  (*Id*. at p. 580.)

The trial court instructed the jury as follows:  "In its initial complaint in this case, [OCS] claimed that it had an oral or implied contract with Meimand Insurance under which Meimand agreed to obtain insurance coverage for theft for Online's car stereo business.  [¶]  The Court—that means the judge—interprets any oral or implied contract to obtain theft coverage as a contract requiring Meimand Insurance to use reasonable efforts to obtain theft coverage.  [¶]  So I wanted you to know that that is a construct that the Court has imposed based on a lot of legal authority about when you promise to go get something, you're really promising to use reasonable efforts to go and get it.  [¶]  So I wanted to bring this to your attention because we have an allegation of oral contract, and it occurred to me that the jury might be looking for an exchange of words where someone said, 'I will use reasonable efforts,' and I wanted to make it clear that this is a judicial construct the way I interpret a promise, 'We'll go get you insurance.'  [¶]  Under the law, that means use reasonable efforts to because you can't guarantee getting an insurance policy when somebody else is going to make the decision; namely, some insurance company out there somewhere.  [¶]  So I wanted you to understand that so you're not looking for an oral contract necessarily where someone said the words 'reasonable efforts.'  That's a judicial interpretation of a contract, if they prove there is one.  Okay?  All right."

13

Although BMIS did not object to this instruction at trial or in its posttrial motions, it now argues that the instruction drafted by the trial court caused it prejudice.[1] Specifically, BMIS argues that the trial court told the jury that the phrase, "we'll go get you insurance" was a promise, which was the very issue the jury was supposed to decide. But BMIS ignores the remainder of the instruction, which specifically told the jury that OCS had to prove that a promise was made.

BMIS also argues that the instruction contradicted the earlier jury instructions on contract formation. To the contrary, these instructions told the jury it had to decide, based on the circumstances, whether a contract was created, and that BMIS contended that no oral or implied contract was formed. The trial court simply instructed the jury that the oral or implied contract required that reasonable efforts be used. This instruction in no way "reframed" OCS's contract claim, as BMIS asserts. The instruction also inured to BMIS's benefit, because it instructed the jury that BMIS was only expected to use reasonable efforts; not best efforts or to exhaust every possible avenue.

Even if the instruction should not have been given, BMIS does not attempt to explain how it is probable that the jury would have reached a verdict more favorable to BMIS in the absence of the instruction. The jury unanimously found that a contract had been formed; the jury was not divided on this issue. And there was substantial evidence to support the jury's finding.

---

[1]    When a trial court gives a jury instruction that is prejudicially erroneous as given, the party harmed by that instruction need not have objected to the instruction or proposed a correct instruction of his own in order to preserve the right to complain of the erroneous instruction on appeal. (*National Medical Transportation Network v. Deloitte & Touche* (1998) 62 Cal.App.4th 412, 428.)

**DISPOSITION**

The judgment is affirmed.  OCS is entitled to its costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
                ASHMANN-GERST


We concur:


_____, P. J.
        BOREN


_____, J.[*]
        FERNS

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.