[No. C058411. Third Dist. Oct. 26, 2009.]

ALISSIA MYERS, Plaintiff and Appellant, v.
TRENDWEST RESORTS, INC., Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication
with the exception of parts III through VIII, inclusive, of the Discussion.

COUNSEL

Law Offices of Stephan Williams, Stephan C. Williams; Law Offices of Daniel Bartley and Daniel R. Bartley for Plaintiff and Appellant.

Curiale Hirschfeld Kraemer, John F. Baum and Felicia R. Reid for Defendant and Respondent.

OPINION

**SIMS, Acting P. J.**—This is the second appeal by plaintiff Alissia Myers in an action against defendant Trendwest Resorts, Inc. (Trendwest), for sexual harassment in employment under the California Fair Employment and Housing Act (Gov. Code, § 12940 et seq.; FEHA). In the prior appeal, we reversed the summary judgment in favor of Trendwest on Myers's FEHA causes of action as well as her claim for punitive damages. We affirmed the dismissal of Myers's common law causes of action relating to her allegations of sexual harassment. (*Myers v. Trendwest Resorts, Inc.* (2007) 148 Cal.App.4th 1403, 1439 [56 Cal.Rptr.3d 501] (*Myers I*).)

After remand, the case proceeded to jury trial on the FEHA claims for sexual harassment (Gov. Code, § 12940, subd. (j)(1)), and failure to take all reasonable steps to prevent harassment (Gov. Code, § 12940, subd. (k)). The jury found that Myers had not been subjected to unwanted harassment.

On appeal, Myers contends the trial court erred by (1) failing to grant judgment notwithstanding the verdict (JNOV) because Trendwest's statement of undisputed facts—made for purposes of summary judgment—admitted she had "suffered severe sex harassment," (2) failing to grant JNOV based on insufficiency of the evidence in support of the verdict, (3) disallowing her expert witnesses from testifying after she filed a tardy expert witness disclosure list, (4) excluding testimony from her treating physician about the cause of her mental distress, (5) excluding the testimony of her human resources expert to bolster Myers's credibility, (6) excluding testimony from Myers's mother and friend about her mental state shortly after her first hospitalization, (7) excluding evidence of other sexual harassment lawsuits against Trendwest, (8) denying Myers's midtrial motion to amend the complaint to state a claim for disability discrimination under FEHA (Gov. Code, § 12940, subd. (k)), and (9) denying her motion for new trial based on jury misconduct.

In the published portion of the opinion, we explain why a statement in Trendwest's statement of undisputed facts, submitted in its summary judgment motion, cannot be used against Trendwest at trial as an admission. We also explain why Myers has waived her claim that no substantial evidence supports the defense verdict. We also commend the trial judge, the Honorable Brian R. Van Camp.

In the unpublished portion of the opinion, we reject Myers's remaining contentions of prejudicial error.

We shall therefore affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

### A

In every appeal, "the appellant has the duty to fairly summarize all of the facts in the light most favorable to the judgment. (*Foreman & Clark Corp. v. Fallon* [(1971)] 3 Cal.3d [875,] 881 [92 Cal.Rptr. 162, 479 P.2d 362].) Further, the burden to provide a fair summary of the evidence 'grows with the complexity of the record. [Citation.]' (*Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 290 [130 Cal.Rptr.2d 436].)" (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1658 [26 Cal.Rptr.3d 638], italics added.)

Myers's statement of facts gives the impression that little else occurred at trial other than her direct examination during her case-in-chief. Trendwest asserts, "The statement of facts in Appellant's Opening Brief . . . focuses exclusively on the evidence Myers submitted at trial in support of her claims. It ignores completely the evidence favorable to Trendwest, including evidence that directly contradicted Myers's evidence." Having perused the lengthy record in this appeal, we agree with Trendwest's characterization of Myers's factual recitation. In setting forth the facts, we shall highlight a few of the most glaring omissions from Myers's statement of facts.

### *Evidence Presented at Trial*

Myers was the victim of sexual abuse while growing up.

In 2001, Trendwest hired Myers to work in its Walnut Creek office selling vacation timeshares. She was about 20 years old at the time. Ayman

Damlakhi was her immediate manager until he was transferred to Trendwest's Roseville office. In August 2002, Myers also began working at the Roseville office.

Myers's statement of facts fails to discuss the following additional testimony at trial: At age six or seven, she was sexually molested by a group of older boys who lived in the neighborhood. When Myers was 13 years old, she left California to live with her friend's family in Arkansas. Over the course of 12 to 18 months, she was sexually molested by her foster father and physically abused by her foster mother.

After her experiences with the foster family in Arkansas, Myers experienced panic attacks and took antianxiety medications. Her treating psychiatrist, Dr. Michael Wright, testified that she probably developed posttraumatic stress syndrome and borderline personality disorder during her teenage years. Expert testimony explained that the hallmarks of a borderline personality disorder are: recounting only the facts in favor of the person's story, exaggeration, denial of personal responsibility, and manipulative behaviors.

When Myers began working at Trendwest, Damlakhi served as a mentor. She enjoyed working and joking with him. When Damlakhi became manager of Trendwest's Roseville office, Myers begged to be transferred to that location.

### *The River Rock Bar Incident*

Myers testified that she joined a group of employees at the River Rock Bar in late November 2002. Myers stated that, in the presence of the other employees, Damlakhi told her that she had nice breasts and that he tried to grope her when the employees later went dancing. According to Myers, Damlakhi asked her for a lap dance, which offended her.

Myers's recitation of the facts fails to mention the following additional evidence about the River Rock incident: Myers chose to sit next to Damlakhi and had two or three glasses of wine. She tried to hand feed him from a plate of food she got for him. Damlakhi denied commenting on her breasts or making any other sexual comments to her. Damlakhi reluctantly went along to the dance club, which Myers had recommended. Myers caught a ride with

Damlakhi, who stopped at his house to change. They then went to Myers's apartment so that she too could change her clothes.

Myers and Damlakhi then drove to the club together where they danced with several other Trendwest employees. Myers continued to drink. Myers pulled Damlakhi away from the others and started "dirty dancing." Damlakhi found it embarrassing and announced that he was going to leave since his friend refused to show up at the dance club. Damlakhi never asked Myers for a lap dance.

One of the Trendwest employees who was at the dance club with them testified that Myers did not give the impression that she was uncomfortable around Damlakhi that night. To the contrary, Myers danced with him in a provocative and flirty manner while Damlakhi "danced like Pee Wee Herman, kind of goofy."

Damlakhi stated that Myers later grabbed his fingers and began sucking on them. Myers told him, "I'll rock your world." Damlakhi pulled away, and Myers responded, "You don't know what you're missing."

A Trendwest employee who had not been to the dance club testified that Myers told him the next day that she "had a good time" at the club.

### Invitation to Las Vegas

Myers testified that she felt harassed by Damlakhi's frequent telephone calls and dinner invitations after the dance club incident. Myers stated she felt especially uncomfortable about Damlakhi's offer to give her $50,000 to let him take her to Las Vegas for the weekend.

Myers's statement of facts fails to mention evidence unfavorable to her characterization of the Las Vegas invitation. On cross-examination, Myers acknowledged agreeing, at least momentarily, to accompany him because she wanted to use the money as a downpayment on a house.

Damlakhi denied ever offering to take Myers to Las Vegas. Instead, he invited his coworker, Rob Tyler, to go with him. Myers spoke up and said that she wanted to go with him. Damlakhi stated she would have to sleep on the suite's sofa while he got the bed. He said that he did not want a sexual harassment lawsuit. Myers jokingly replied, "I need someone to sue." Damlakhi and Myers never went to Las Vegas together.

### Driving for Dollars

"Driving for dollars" referred to a tactic in which sales representatives accompanied potential buyers back to their homes to retrieve the initial

payment on a timeshare. Myers claimed she suffered two sexual assaults while she and Damlakhi were driving for dollars.

Myers testified that Damlakhi accompanied her in following a customer home in March 2003. Myers stated that Damlakhi insisted on going with her even after she strongly objected. After Myers and Damlakhi received the customer's payment, he started questioning her about her sex life. She testified that Damlakhi told her he could satisfy her sexually. He pulled the car off the road, kissed her neck, and fondled her legs. She testified that he succeeded in putting his hand down her pants and groping her breasts despite efforts to fend him off. After she convinced him to drive her back to the office, Damlakhi put her hands in his groin "to tell [her] how hard he was and how much he wanted [her]." When they arrived at the office, Damlakhi apologized and said he was "a little lonely right now."

Myers testified that the second sexual assault by Damlakhi occurred in May 2003, when he again insisted on accompanying her in driving for dollars. After securing payment from the customer, Damlakhi drove Myers back to his house. He pulled the car into the garage and shut the garage door by remote control. Damlakhi then put his hand up her dress and tried to kiss her. When she got out of the car, he pushed against her to simulate sexual intercourse while undoing her bra and groping her breasts. Myers broke free and ran out the side door. Damlakhi ran after her, apologized, and drove her home.

Myers's recitation of the facts fails to mention the following additional evidence about the "driving for dollars" incidents: Damlakhi denied ever asking about Myers's sex life. Although Damlakhi admitted he went "driving for dollars" with Myers in March 2003, he denied touching her or making any detour on the way back to the office from the customer's house. Because it was close to midnight when Myers secured the payment, Damlakhi wanted to get back to the office where other employees were waiting to complete the paperwork.

As to the incident in May 2003, Damlakhi denied taking Myers to his house or touching her on the way back to the office.

Myers admitted that she never told anyone at Trendwest about the assaults while she was employed there. She testified that she told her coworker, Daniel Henry, that she was "scared" of Damlakhi and asked Henry to accompany her and Damlakhi during the March 2003 drive. Henry testified he was asked to accompany them, but recalled that Myers did not want to drive for dollars because everyone hated the sales tactic and the hour was late. Henry never saw Damlakhi engage in any inappropriate conduct with Myers.

### *Myers's First Hospitalization*

In June 2003, Myers was hospitalized for two weeks at Sutter Center for Psychiatry. At trial and on appeal, Myers claims she suffered an emotional and mental collapse due to Damlakhi's sexual harassment.

However, Myers fails to acknowledge important additional evidence. Myers's admission chart indicated a host of factors as precipitating her nervous breakdown including being molested as a child by neighborhood boys, being abused by her foster father and brothers, her belief that her mother was trying to kill her, relationship difficulties with her boyfriend, and her "feeling" that she was being sexually harassed by Damlakhi. The progress notes indicated that Myers's main goal upon discharge was to separate from the boyfriend with whom she lived.

The June 2003 hospitalization records indicate that she was feeling anxious and suicidal without knowing the cause. Although the records of her hospitalization and subsequent therapy indicated abuse by her childhood attackers as well as her foster father and brothers, no mention is found of sexual assault by Damlakhi.

Myers fails to note that the trial court expressly found that her hundreds of pages of medical records "were devoid of any reference by her to" sexual assaults by Damlakhi.

Christine McGowan, Trendwest's Roseville officer manager, testified that she and Damlakhi visited Myers in the hospital. Myers jumped out of bed and told Damlakhi she was glad he had come to visit. She further testified Myers gave both of them big hugs, saying, "she missed being at work and couldn't wait to get back." She had already talked to someone about buying a timeshare and was excited to get back to work. During the visit, Myers asked Damlakhi for money so that she could move out of the apartment she shared with her boyfriend. Damlakhi ended up advancing her $1,500.

### *Lake Tahoe Ski Trip*

In November 2003, Myers returned to work. That month, some of the sales representatives from the Roseville office went on an annual skiing trip to Lake Tahoe. Myers testified that shortly after arriving at the slopes, Damlakhi grabbed her arm and smacked her on the buttocks. She exclaimed, "Don't touch me. Don't touch me. You said you weren't going to touch me." Myers ran to tell her friend, Felicia Torrez. Myers also told Torrez that Damlakhi had tried to get her to go to the hotel room with him.

Myers's factual recount fails to acknowledge the following additional evidence regarding the Tahoe incidents: Myers testified that she also told coworkers Steve Wilcox and Al Catlin about being smacked on the buttocks as soon as she got to the top of the ski slope. Both Wilcox and Catlin testified that Myers never told them about the incident or any other sexual harassment by Damlakhi. Moreover, neither saw Damlakhi inappropriately touch Myers at any time. Damlakhi denied ever smacking Myers on the buttocks. He explained that he had playfully pushed Myers's back because everyone was playing and falling in the snow when they arrived at Lake Tahoe.

Myers's claim that Damlakhi invited her to the hotel room refers to her testimony that Damlakhi was cold and wanted to leave the ski slopes because he was not a good skier. When Myers refused to leave, Damlakhi asked for the keys to the car so he could return to the hotel room. Damlakhi did not have his own room, but slept on the sofa of the suite in which all of the employees were staying. In the suite, Myers and Torrez shared their own room. Catlin—whom Myers acknowledged to be honest—testified that he observed Myers the next morning climb on top of a sleeping Damlakhi and stick her tongue in his ear to wake him up. This visibly upset Damlakhi.

### *Myers's Second Hospitalization*

In December 2003, Myers was hospitalized after she cut her wrists and burned herself. Myers told a coworker from Trendwest that her hospitalization was due to childhood abuse. The discharge summary indicates that Myers claimed symptoms of depression and suicidal thoughts "following sexual harassment at work." The documents for the hospitalization indicate that she reported "her supervisor has been sexually harassing her at work, has been physically very inappropriate."

Also in December 2003, Trendwest terminated Myers's employment due to the length of her medical leave. In January 2004, Myers learned of Trendwest's "Integrity Hotline" and called to complain about (1) being dismissed when she had only been on medical leave for four months, and (2) sexual harassment by Damlakhi. Myers was assured that the complaints would be investigated and she would be informed of the outcome within a few days. Two weeks later, Myers again called the Integrity Hotline and was told that there was no record of her prior call.

### B

Any impartial reader who approaches Myers's briefs unfamiliar with the testimony at trial must come away with a sense of bafflement as to why

the jury and trial court did not decide in her favor—especially given the seemingly uncontradicted testimony regarding the sexual assaults leading to her mental distress.

Only upon perusing the record does it become clear that the trial court found Myers's credibility to be problematic. The trial court, in ruling on her motion for JNOV, considered testimony that she flirted with Damlakhi, "dirty danc[ed]" with him, agreed to go to Las Vegas with him, woke him during the ski trip by climbing on top of him and sticking her tongue in his ear, and the fact that her hundreds of pages of medical records fail to contain a single mention of sexual assault by Damlakhi. Myers offers no discussion of these facts unfavorable to her arguments.

■ Professional ethics and considerations of credibility in advocacy require that appellants support their arguments with fair and accurate representations of trial court proceedings. (Cal. Rules of Court, rule 8.204(a)(2); Rules of Prof. Conduct, rule 5-200.) As we have previously explained, "it behooves counsel to comply with the rules in order to be better advocates for their clients. We are a busy court which 'cannot be expected to search through a voluminous record to discover evidence on a point raised by [a party] when his brief makes no reference to the pages where the evidence on the point can be found in the record.' " (*Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 113 [113 Cal.Rptr.2d 90], disapproved on another ground as recognized in *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 41–42 [34 Cal.Rptr.3d 520], quoting *Metzenbaum v. Metzenbaum* (1950) 96 Cal.App.2d 197, 199 [214 P.2d 603].) Myers's opening and reply briefs fall far short of complying with the rules regarding statements and discussions of evidence adduced at trial.

## C

### *Procedural History*

In February 2005, Myers filed her third amended complaint against Damlakhi and Trendwest to allege causes of action for sexual harassment arising under FEHA and common law. The trial court granted summary judgment in favor of Trendwest. Myers appealed, and we reversed as to the FEHA and punitive damages claims. (*Myers I, supra*, 148 Cal.App.4th at p. 1439.)

After remand, the case proceeded against Damlakhi and Trendwest. At the start of trial, Myers announced that she had settled with Damlakhi. Trial ended with the jury's verdict that Myers had not been "subject to unwanted harassing conduct because she was a woman." The court polled the jury, revealing a 10 to two vote in favor of the verdict. Judgment was entered in favor of Trendwest.

Myers filed motions for JNOV and for new trial, which the trial court denied.

## DISCUSSION

## I

### Estoppel Based on the Statement of Undisputed Facts Accompanying a Motion for Summary Judgment

Myers argues the trial court erroneously denied JNOV on the issue of liability because Trendwest was estopped from denying Damlakhi sexually harassed her. Myers relies on Trendwest's statement of undisputed facts accompanying the motion for summary judgment as a judicial admission of the facts contained therein. The argument is without merit.

Judicial admissions may be made in a pleading, by stipulation during trial, or by response to request for admission. (4 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 452, p. 585; *Brigante v. Huang* (1993) 20 Cal.App.4th 1569, 1578 [25 Cal.Rptr.2d 354], disapproved on other grounds in *Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 977, 983, fn. 12 [90 Cal.Rptr.2d 260, 987 P.2d 727].) Facts established by pleadings as judicial admissions " 'are conclusive concessions of the truth of those matters, are effectively removed as issues from the litigation, and may not be contradicted, by the party whose pleadings are used against him or her.' (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2002) ¶ 10:147, p. 10-49; *Foxborough v. Van Atta* (1994) 26 Cal.App.4th 217, 222, fn. 3 [31 Cal.Rptr.2d 525]; *Brown v. City of Fremont* (1977) 75 Cal.App.3d 141, 146 [142 Cal.Rptr. 46].) ' "[A] pleader cannot blow hot and cold as to the facts positively stated." ' (*Brown v. City of Fremont, supra*, at p. 146.)" (*St. Paul Mercury Ins. Co. v. Frontier Pacific Ins. Co.* (2003) 111 Cal.App.4th 1234, 1248 [4 Cal.Rptr.3d 416], italics omitted (*St. Paul Mercury*).)

Not every document filed by a party constitutes a pleading from which a judicial admission may be extracted. Code of Civil Procedure section 420 explains that pleadings serve the function of setting forth "the formal allegations by the parties of their respective claims and defenses, for the judgment of the Court." (Code Civ. Proc., § 420.) "The pleadings allowed in civil actions are complaints, demurrers, answers, and cross-complaints." (Code Civ. Proc., § 422.10.) When these pleadings contain allegations of fact in support of a claim or defense, the opposing party may rely on the factual statements as judicial admissions. (*St. Paul Mercury, supra*, 111 Cal.App.4th at p. 1248.)

In moving for summary judgment, a party may rely on the doctrine of judicial admission by utilizing allegations in the opposing party's pleadings to eliminate triable issues of material fact. (*St. Paul Mercury, supra*, 111 Cal.App.4th at p. 1248.) However, neither a motion for summary judgment nor its accompanying statement of undisputed facts constitutes pleadings within the meaning of Code of Civil Procedure section 422.10. Motions for summary judgment do not serve the same purpose as pleadings in setting forth factual allegations. To the contrary, motions for summary judgment by defendants seek to show that they are entitled to dismissal as a matter of law. (Code Civ. Proc., § 437c; *Myers I, supra*, 148 Cal.App.4th at p. 1409.)

Trendwest's motion for summary judgment argued that it was entitled to dismissal of Myers's case even if her allegations regarding Damlakhi's conduct were true. In our prior decision, we noted: "Trendwest accepted as undisputed fact *for summary judgment purposes* that Damlahki made sexual advances to plaintiff on two 'driving for dollars' trips in March and May 2003." (*Myers I, supra*, 148 Cal.App.4th at p. 1412, italics added.) Trendwest's summary judgment motion gave every indication that the factual admissions concerning Damlakhi's conduct toward Myers were made solely for the purpose of seeking a dismissal as a matter of law.

That Myers focuses on facts set forth in the statement of undisputed facts rather than in the memorandum of points and authorities makes no difference. As a leading treatise explains, "The agreement in the separate statement that a fact is 'undisputed' is a concession only for purposes of the summary judgment motion. It is not evidence (because not under oath or verified); nor is it a judicial admission." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2008) ¶ 10:194, p. 10-71 (rev. # 1, 2009), citing *Wright v. Stang Manufacturing Co.* (1997) 54 Cal.App.4th 1218, 1224 [63 Cal.Rptr.2d 422] (*Wright*).)

In *Wright*, defendants sought to defeat a products liability claim by making "a great deal out of the fact that plaintiffs responded 'Undisputed' to [a] separate statement of fact . . . ." (*Wright, supra*, 54 Cal.App.4th at p. 1224, fn. 2.) On appeal, the defendants argued that the plaintiffs' failure to contest a statement of undisputed fact amounted to a judicial admission that the product was not defective. (*Id.* at p. 1225.) The Court of Appeal rejected the defendant's argument, holding that the defendants "fail[ed] to establish that plaintiffs' response to their separate statement of undisputed facts [should have been] accorded the same effect as a judicial admission in a pleading." (*Ibid.*) The *Wright* court held that separate statements of undisputed facts in support of a motion for summary judgment or adjudication make no binding judicial admissions. (*Ibid.*; Code Civ. Proc., § 422.10.)

Myers's cited cases do not hold to the contrary. *Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264, 1271 [127 Cal.Rptr.2d 436], does hold that admissions in pleadings conclusively bind the pleader—as Myers contends. However, that case involved admissions made in an actual pleading: an answer to a cross-complaint. (*Ibid.*; Code Civ. Proc., § 422.10.) *Valerio* offers no support for holding that summary judgment motions constitute pleadings for purposes of judicial admissions. (*Valerio, supra*, at p. 1271.)

The remainder of Myers's cited cases considered the impact of admissions and failures to dispute facts at the summary judgment stage. (*Leep v. American Ship Management* (2005) 126 Cal.App.4th 1028, 1039 [24 Cal.Rptr.3d 463] [reversing summary judgment when issue of material fact existed regarding actual period of employment of seamen by vessel's owner]; *Collins v. Hertz Corp.* (2006) 144 Cal.App.4th 64, 71–73 [50 Cal.Rptr.3d 149] [affirming summary judgment after the trial court properly exercised its discretion to strike portions of the plaintiffs' separate statement that did not conform to the Code of Civil Procedure]; *Stanton Road Associates v. Pacific Employers Ins. Co.* (1995) 36 Cal.App.4th 333, 345 [43 Cal.Rptr.2d 1] [affirming summary judgment in favor of insurers because contamination manifested after the policies had lapsed]; *People ex rel. Dept. of Transportation v. Ad Way Signs, Inc.* (1993) 14 Cal.App.4th 187, 200–201 [17 Cal.Rptr.2d 496] [reversing summary judgment because issue of material fact existed as to whether a permit for roadside billboard had been revoked].) None of these cases considered whether admissions or failures to contest facts at the summary judgment stage later estopped a party from presenting contrary evidence at trial.

Accepting Myers's argument would require us to force defendants to play a risky game of roulette whenever moving for summary judgment. To secure dismissals for lack of triable issues of material fact, defendants would have to conclusively surrender the chance to contest facts they might believe themselves able to disprove. Unsuccessful summary judgment motions would leave defendants bound by judicial admissions regarding facts only because they sought judgment as a matter of law. Motions for summary adjudication of less than all causes of action would necessarily be unwise because a defendant would be certain to face trial on at least one cause of action while bound by all facts deemed undisputed in moving for summary adjudication.

■ Summary judgment provides "courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493].) We will not undermine the value of this procedural vehicle for ascertaining whether

triable issues of fact exist by holding that the separate statements of undisputed fact can haunt unsuccessful movants if the case goes to trial.

There is no merit to Myers's contention that Trendwest's statement of undisputed facts made for purposes of summary judgment constituted judicial admission of facts contained therein.

## II

### Insufficiency of the Evidence

Myers contends the trial court erred in denying her motion for JNOV.

Myers argues no substantial evidence supports the defense verdict. However, this claim is waived because, as we have recounted at length above, Myers has failed to set out all the evidence that supports the defense verdict. "[I]f . . . 'some particular issue of fact is not sustained, [appellants] are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence.* Unless this is done the error is deemed to be waived.' " (*Foreman & Clark Corp. v. Fallon, supra,* 3 Cal.3d at p. 881.)

By failing to recount much defense evidence, plaintiff Myers has waived her claim of lack of substantial evidence to support the verdict.[1] The trial court did not err in denying her motion for JNOV.

### III–VIII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### IX

### Commendation of Trial Judge

We commend the trial judge, the Honorable Brian R. Van Camp, for doing an exemplary job on a case presenting some difficult legal issues.

---

[1] We say Myers "waived" her claim because that is the terminology used in 1971 in *Foreman & Clark.* Modern usage would say Myers has "forfeited" her claim. (See, e.g., *Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264–265 [92 Cal.Rptr.3d 862, 206 P.3d 403]; *People v. Stowell* (2003) 31 Cal.4th 1107, 1114 [6 Cal.Rptr.3d 723, 79 P.3d 1030].)

*See footnote, *ante,* page 735.

## DISPOSITION

The judgment is affirmed. Trendwest shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

Robie, J., and Cantil-Sakauye, J., concurred.

On November 20, 2009, the opinion was modified to read as printed above.