Filed 1/27/16

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| KATHY L. SEACRIST et al, | |
| Plaintiffs and Appellants, | E061294 |
| v. | (Super.Ct.No. INC1103491) |
| SOUTHERN CALIFORNIA EDISON COMPANY, | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County. John G. Evans, Judge. Reversed.

Swanson & Peluso and Julia S. Swanson for Plaintiffs and Appellants.

Munger, Tolles & Olson, Stephen M. Kristovich, Jeremy A. Lawrence; Southern California Edison, Patricia A. Cirucci, Brian A. Cardoza and Carla M. Blanc for Defendant and Respondent.

In a Fourth Amended Complaint, Kathy Seacrist and her son, John McDonald, sued (1) Southern California Edison (Edison); (2) the City of Palm Desert; (3) J.R.

Roberts; and (4) Does 5 through 100. The Fourth Amended Complaint included seven causes of action against Edison: (a) negligence; (b) nuisance; (c) trespass; (d) strict liability/products liability; (e) strict liability/implied warranty of fitness; (f) strict liability/ultra hazardous activity; and (g) intentional infliction of emotional distress.

Seacrist owned a home near an Edison substation. Seacrist and McDonald (collectively, "plaintiffs") alleged stray electrical currents from the substation were causing them to suffer various medical issues. The trial court sustained Edison's demurrer to the Fourth Amended Complaint without leave to amend. The trial court concluded, "Plaintiffs claims are within the exclusive jurisdiction of the California Public Utilities Commission," and thus, the trial court did not have jurisdiction over the dispute with Edison. The trial court sustained the demurrer on March 5, 2014.

On February 9, 2015, the Second District, Division Four, Court of Appeal held the California Public Utilities Commission (PUC) does not have exclusive jurisdiction over a case involving injuries resulting from stray electrical currents from a substation. (*Wilson v. Southern California Edison Company* (2015) 234 Cal.App.4th 123, 129, 151 (*Wilson*).) On appeal, plaintiffs contend the trial court erred by sustaining Edison's demurrer because the PUC does not have exclusive jurisdiction over claims related to injuries from stray electrical currents. Edison asserts, among other things, that *Wilson* was wrongly decided. We reverse the judgment.

**FACTUAL AND PROCEDURAL HISTORY**

A. FOURTH AMENDED COMPLAINT

The facts in this paragraph are taken from plaintiffs' Fourth Amended Complaint (FAC). In 1992, Edison's Indian Wells substation was constructed. Seacrist's home was in the Desert Rose development, in Palm Desert, which was next to the Indian Wells substation. In 1997, Seacrist purchased and moved into her home in Palm Desert. McDonald moved into Seacrist's home in 2006, and moved out in 2009. Stray electrical currents from the substation caused dangerously high voltage "in the ground and in and about and throughout" Seacrist's home. The stray electrical currents caused plaintiffs to suffer serious health issues.[1]

In the first cause of action for negligence, plaintiffs alleged Edison was negligent because it permitted "excessive electric current from the Indian Wells Substation" to enter plaintiffs' land. Plaintiffs alleged Edison "negligently, carelessly, recklessly, unlawfully, and with gross negligence, managed, owned, operated, leased, possessed,

---

[1] Background information about electrical distribution systems: "In order for electricity to flow, there must be a complete circuit. In other words, when electricity is sent out . . . it must have a return path. Typically, electricity is sent over one conductor (wire), called the 'hot,' and returns on another conductor called the neutral." (*Wilson*, *supra*, 234 Cal.App.4th at p. 130.) "For safety reasons, electrical systems usually are grounded. That means that at various points in the system, including at the substation, a connection is made from the neutral to the ground, i.e., the earth. Because the earth is conductive, it can provide a return path for the flow of electricity." (*Id.* at p. 131.) "In a grounded electrical system, there will always be some current flowing back to the substation through the earth. This is referred to as neutral-to-earth voltage, or NEV, and it cannot be entirely eliminated. NEV is one cause of 'stray voltage.'" (*Ibid.*)

secured, designed, modified, installed, constructed, engineered, and controlled the Indian Wells Substation."

In the second and third causes of action (for nuisance and trespass) plaintiffs alleged "residential properties and homes located adjacent to the Indian Wells Substation, were, and are, subject to entry by stray, uncontrolled electrical currents that are generated, emitted, and traveling from said substation, and there were, and continue to be, excessive electric currents and voltage from said adjacent substation resulting in dangerously high levels of current and magnetic frequency in, about, and throughout adjacent residential properties and homes, including the Home of Plaintiffs."

In the fourth cause of action (for products liability), plaintiffs alleged Edison was subject to strict liability "for personal injuries caused by the straying of electricity at dangerously high current levels due to the improper grounding of the Indian Wells Substation." In the fifth cause of action (for breach of the implied warranty of fitness), plaintiffs asserted they were harmed "[a]s a direct, proximate, and legal result of the defective Indian Wells Substation due to its improper grounding."

In the sixth cause of action (for strict liability based upon an ultra hazardous activity), plaintiffs alleged Edison's "use, maintenance, and operation of an electrical substation emitting large amounts of electrical currents and voltage when not properly grounded and located immediately adjacent to a residential neighborhood constitutes ultra[]hazardous activity." Plaintiffs further alleged that stray electrical currents were in and throughout their residence.

4

In their seventh cause of action (for intentional infliction of emotional distress), plaintiffs asserted their home was "subject to stray, uncontrolled electrical currents, generated, emitted and traveling from the Indian Wells Substation." Plaintiffs asserted the substation was "improperly grounded."

Plaintiffs sought damages, punitive damages, disgorgement, an injunction prohibiting Edison from further harming plaintiffs, costs, interest, and any other proper relief.

B. DEMURRER

Edison demurred to the FAC. Edison asserted the Superior Court lacked jurisdiction to decide plaintiffs' seven claims. Edison argued plaintiffs' claims fell within the exclusive jurisdiction of the PUC.

Our Supreme Court has articulated a three-prong test for determining whether a claim falls within the PUC's exclusive jurisdiction: (1) whether the PUC *has the authority* to adopt a policy on (a) the alleged problematic/risky condition, e.g., stray voltage, and (b) "what action, if any, the utilities should take to minimize that risk"; (2) whether the PUC *has exercised its authority* to adopt a policy concerning the problematic/risky condition; and (3) whether the lawsuit would hinder or interfere with that policy. (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 923, 926, 935 (*Covalt*).)

First, in its demurrer, Edison asserted the PUC has the authority to issue regulations related to substation safety and "all aspects of electrical distribution facilities." Second, Edison asserted that in General Order 174, the PUC adopted safety

5

regulations governing substations.  Third, Edison argued plaintiffs' lawsuit would interfere with the PUC's policy because plaintiffs were essentially challenging the safety regulations issued by the PUC.

C.    OPPOSITION

Plaintiffs opposed Edison's demurrer.  Plaintiffs asserted the PUC did not have exclusive jurisdiction over their claims because their claims were focused on currents running through the ground/earth—not problems with the electrical lines or substation. Plaintiffs noted that PUC Rule 36.4 prohibits utilities from using the ground/earth as a normal neutral to return electricity along the circuit; however, a neutral may be grounded into the earth for purposes of stabilization and protection.  Plaintiffs asserted their claims were based upon "electric current[s] straying through the ground from the neutral which becomes overloaded as it returns and comes close to the substation." Plaintiffs contended, "[T]his lawsuit relies on Rule 36.4.  It does not interfere with Rule 36.4."  Plaintiffs contended Edison violated Rule 36.4, and therefore, Public Utilities Code section 2106[2] brought the claims within the Superior Court's jurisdiction.

Section 2106 provides, "Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting

_____

[2] All subsequent statutory references will be to the Public Utilities Code, unless otherwise indicated.

6

therefrom. If the court finds that the act or omission was willful, it may, in addition to the actual damages, award exemplary damages. An action to recover for such loss, damage, or injury may be brought in any court of competent jurisdiction by any corporation or person."

D.    REPLY

Edison replied to plaintiffs' opposition. Edison accused plaintiffs of "attempting to change the theory of their claims." Edison argued, "Plaintiffs ignore that nowhere in their [FAC] is there any reference to 'underground power lines,' to use of the 'ground and earth . . . as the return of the current to the substation, or that [Edison] is violating any [General Order] or regulation of the PUC, let alone Rule 36.4." Edison contended the FAC alleged the problematic acts involved electrical currents "'emitted from a substation,'" (italics omitted) as opposed to currents returning to the substation. Edison asserted plaintiffs could not rely on new facts to avoid dismissal of the FAC, and currents emitted from the substation are regulated by the PUC.

Edison argued plaintiffs should be denied leave to amend because if the new facts about stray voltage resulting from the current returning to the substation were included in a fifth amended complaint, the claims would still fall within the PUC's exclusive jurisdiction. Edison asserted the PUC had not defined, within Rule 36.4, what it means "to use the earth/ground as 'a normal return or circuit conductor,'" and the PUC has exclusive jurisdiction to interpret its own Rule 36.4 and decide if Edison's system violated that rule. Thus, Edison asserted section 2106 did not apply because in order to determine if Edison was violating Rule 36.4, the court would need to decide

7

"the meaning of [using] the ground or earth as 'a normal return or circuit conductor' in Rule 36.4," and such rule interpretation by the court would undermine the PUC's regulatory authority.

E.      HEARING

On February 19, 2014, the trial court held a hearing on Edison's demurrer. At the hearing, plaintiffs requested leave to amend. Plaintiffs said, "I recognize that the [FAC] did not perhaps clarify to the extent that—as to why this should not fall under General Order 174 which does give PUC jurisdiction. The reason being that the cause of the ground current, the electric current, string current was the distribution wiring. It was not the substation itself. And Rule 174 covers the substation. [¶] So that is why it should not pertain to that rule, but I would like to amend the Complaint to be able to clarify that in the Complaint." Plaintiffs asserted the substation was not the cause of the stray current; rather, it was the size of the wiring used as the neutral return. Plaintiffs explained the wires "should have been larger so as to handle the amount of electricity that was on the return to the substation."

Edison argued "the PUC has exclusive comprehensive jurisdiction over the entire distribution system, substation, overhead lines, [and] underground lines." Edison asserted the PUC was the entity responsible for regulating the design, construction, operation, and maintenance of the electrical distribution systems. Edison asserted plaintiffs needed to file a claim with the PUC, explain why there was an alleged

8

violation, then, if the PUC agreed there has been a violation, the plaintiffs may return to court. (§ 1702.)[3]

Plaintiffs asserted Edison's jurisdiction argument relied on General Order 174, which related to substations. Plaintiffs argued their claim related to the distribution system (not the substation), which is not included in General Order 174. Plaintiffs contended their claim related to a violation of Rule 36.4, which concerned the earth not being used a normal return for electric currents.

The court said, "All right. The Court sustains the demurrer as to Southern California Edison Company without leave to amend." In the written order, the trial court explained that it sustained the demurrer "on the ground that Plaintiffs' claims are within the exclusive jurisdiction of the [PUC]." The court did not state reasons as to why it concluded the claims fell within the PUC's exclusive jurisdiction.

## DISCUSSION

### A.    CONTENTION

On appeal, plaintiffs contend the *Wilson* case is on-point and should be followed by this court. (*Wilson*, *supra*, 234 Cal.App.4th 123.)

---

[3] Section 1702 provides, in relevant part, "Complaint may be made by the commission of its own motion or by any corporation or person . . . by written petition or complaint, setting forth any act or thing done or omitted to be done by any public utility, including any rule or charge heretofore established or fixed by or for any public utility, in violation or claimed to be in violation, of any provision of law or of any order or rule of the commission."

B.    STANDARD OF REVIEW

"A demurrer is properly sustained when the complaint 'does not state facts sufficient to constitute a cause of action,' or where the court 'has no jurisdiction [over] the subject of the cause of action alleged in the pleading.'" (*Debrunner v. Deutsche Bank Nat. Trust Co.* (2012) 204 Cal.App.4th 433, 438; Code Civ. Proc., § 430.10, subds. (a) & (e).)  We apply the de novo standard when reviewing a trial court's ruling sustaining a demurrer.

C.    JUDICIAL ADMISSIONS

Edison contends plaintiffs are bound by the statements they made "in connection with their Opposition to [Edison's] Demurrer that their claims are not based on anything emitted from the substation, but rather on stray current allegedly resulting from [Edison's] use of the 'ground or earth' as 'a normal return,' in violation of Rule 36.4. Plaintiffs confirmed this basis of their claims (i) after four amendments of their complaint in the trial court, (ii) in their Opposition to [Edison's] Demurrer, (iii) at oral argument on the Demurrer, and (iv) in their motion for reconsideration."

"Judicial admissions may be made in a pleading, by stipulation during trial, or by response to request for admission." (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 746.)  Notably, Edison does not assert plaintiffs' theory was made in a pleading, by stipulation during trial, or in response to a request for admission.  Edison asserts the "admissions" were made after the pleadings and in various arguments.

Further, the facts and legal theories upon which plaintiffs are relying, in complaining of injuries resulting from stray electrical currents, are found in the FAC.

10

As two examples: (1) plaintiffs allege in the "Factual Issues" section of the FAC, "Only when the stray electricity cause of the further injuries was discovered did Plaintiffs learn of the additional concurrent cause of their additional injuries which were not mold-related"; and (2) plaintiffs allege in the negligence cause of action, "[T]heir serious medical and health problems were, and are, a direct, proximate, and legal result of the stray, uncontrolled excessive electric current."

Because (1) the facts and theory of fault upon which plaintiffs are relying are included in the FAC; and (2) the comments about Rule 36.4 were not made in a format that would cause them to be judicial admissions, we conclude plaintiffs are not bound by the theory that jurisdiction is based upon a violation of Rule 36.4.

    D.    *WILSON*

In *Wilson*, the plaintiff (Wilson) sued Edison for intentional infliction of emotional distress, negligence, and nuisance. Wilson's "claims alleged, in essence, stray voltage generated by the Topaz substation entered into Wilson's home, causing shocks to Wilson, and that Edison knew of the stray voltage from the substation . . . and failed to maintain the safety of the residents living next to the substation. Wilson contended at trial that any level of stray voltage on the property was unacceptable, and Edison was liable for failing to eliminate it." (*Wilson*, *supra*, 234 Cal.App.4th at pp. 139-140, fn. omitted.) Wilson prevailed at trial and was awarded damages. Edison raised the PUC's exclusive jurisdiction for the first time in a motion for judgment notwithstanding the verdict. The trial court denied the motion. (*Id*. at p. 140.)

On appeal, Edison argued Wilson's claims fell within the PUC's exclusive jurisdiction. The appellate court disagreed, finding the trial court had jurisdiction over the claims. (*Wilson*, *supra*, 234 Cal.App.4th at p. 140.) Edison asserted (1) the PUC had broad authority to regulate electrical distribution systems; (2) the PUC had exercised its authority by issuing regulations "for every possible aspect of electric distribution systems"; and (3) the jury's award interfered with the PUC's regulations by imposing liability on Edison for stray voltage that resulted from Edison complying with the PUC's regulations and effectively finding Edison was required to eliminate stray voltage, which is not a requirement set forth by the PUC.[4] (*Id*. at p. 147.)

In Wilson's appellate brief, she focused on the second *Covalt* prong, asserting the PUC did not specifically regulate stray voltage so the claim did not fall within the PUC's exclusive jurisdiction. (*Wilson*, *supra*, 234 Cal.App.4th at p. 148.) The appellate court concluded a specific regulation was not required in order to trigger exclusive jurisdiction, but concluded the general nature of the PUC's regulations resulted in Edison being unable to show that Wilson's claims would hinder or interfere with a PUC policy, i.e., the third prong of the *Covalt* test. (*Id*. at p. 150.)

The appellate court gave three different reasons in support of its conclusion. The appellate court's first reason was "although there is no doubt that the General Orders

---

[4] For ease of reference, as set forth *ante*, the *Covalt* questions are: (1) whether the PUC *has the authority* to adopt a policy on (a) the alleged problematic/risky condition, e.g., stray voltage, and (b) "what action, if any, the utilities should take to minimize that risk"; (2) whether the PUC *has exercised its authority* to adopt a policy concerning the problematic/risky condition; and (3) whether the lawsuit would hinder or interfere with that policy. (*Covalt*, *supra*, 13 Cal.4th at pp. 923, 926, 935.)

require grounding of substations, it may be that Edison could comply with the regulations and still mitigate the stray voltage that results from grounding." (*Wilson*, *supra*, 234 Cal.App.4th at p. 149.) In other words, any mitigation that may be necessary due to the court case could possibly be accomplished without hindering the PUC's existing regulations related to grounding.

In presenting its second reason, the appellate court observed that General Order 174 requires electric utilities to "establish and update an inspection program for its substations, maintain records of its inspections, and submit annual inspection program summaries and reports summarizing completed inspections." (*Wilson*, *supra*, 234 Cal.App.4th at p. 150.) Additionally, utilities must "meet annually to share their newly developed practices and review their own practices in light of other utilities' practices, with the expectation that 'a "best practice" will evolve that shows how to most effectively operate and safely control the electric systems in California.'" (*Ibid.*) The appellate court wrote, "it is unclear whether this 'best practice' will address stray voltage issues. Therefore, we cannot say with any certainty that litigation of Wilson's claims would hinder or interfere with the PUC's regulatory policy." (*Ibid.*) In other words, "best practices" is so broad it may or may not include stray voltage issues, and therefore, it cannot be said the PUC's policy will be hindered by the litigation.

As a third reason, the appellate court explained that prior contrary cases, in which it was concluded the PUC had exclusive jurisdiction over parties' claims, were "of a vastly different character" because they tended to involve issues in which "the PUC conducted (or was in the process of conducting) investigations into or adopted

13

regulations on the specific issue alleged in the plaintiffs' lawsuit." (*Wilson*, *supra*, 234 Cal.App.4th at p. 150.)

In concluding, the appellate court wrote, "In light of the absence of any indication that the PUC has investigated or regulated the issue of stray voltage, and without any evidence that stray voltage cannot be mitigated without violating the PUC's regulation requiring grounding, we cannot say that Wilson's lawsuit would interfere with or hinder any supervisory or regulatory policy of the PUC. Therefore, we hold that Wilson's claims are not within the exclusive authority of the PUC under section 1759."[5] (*Wilson*, *supra*, 234 Cal.App.4th at p. 151.)

We see nothing internally inconsistent in *Wilson*, such that we would conclude the case was wrongly decided. The appellate court, for three different and logical reasons, concluded the third prong of the *Covalt* test was not met by Edison. Accordingly, we do not reject *Wilson* outright. Instead, we must decide if it is applicable in the instant case; however, we will first address Edison's assertions that *Wilson* was wrongly decided.

First, Edison contends *Wilson* was wrongly decided because the appellate court did not explicitly address all three prongs of the *Covalt* test. In particular, Edison

---

[5] Section 1759 provides: "(a) No court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, as provided by law and the rules of court. [¶] (b) The writ of mandamus shall lie from the Supreme Court and from the court of appeal to the commission in all proper cases as prescribed in Section 1085 of the Code of Civil Procedure."

asserts the appellate court failed to address the first two prongs of the *Covalt* test, i.e. authority and the exercise of authority. The *Wilson* court did not need to address the first two prongs of the *Covalt* test in detail because it found in favor of Edison on those prongs. The appellate court wrote, "[T]here is no doubt that the General Orders [of the PUC] require grounding of substations." (*Wilson*, *supra*, 234 Cal.App.4th at p. 149.) Thus, the court found (1) the PUC had the authority to issue regulations in the relevant area, and (2) the PUC had exercised its authority to do so. The primary question in the case, and the issue the appellate court focused upon was the third prong—whether the litigation would interfere with that policy. (*Id.* at pp. 149-151.) Thus, we are not persuaded that the case was wrongly decided—the first two prongs did not need to be addressed in detail given the manner in which the *Wilson* court resolved the dispute.

Second, in regard to the *Wilson* court's first line of reasoning—that there was no evidence the possible voltage mitigation would interfere with the PUC's policy—Edison contends that reasoning is incorrect because the opinion "provides no authority or explanation for why factual development on this issue should play a role in determining whether the PUC has exclusive jurisdiction." Whether mitigation would interfere with the PUC's policy is relevant to the third prong of the *Covalt* test. Wilson, in her lawsuit, was requesting the stray voltage be eliminated. (*Wilson*, *supra*, 234 Cal.App.4th at p. 140.) Thus, the court had to consider whether this request, to eliminate or mitigate the voltage, i.e., somehow resolve the stray voltage problem, would interfere with the PUC's policy, per the third prong of the *Covalt* test. (*Covalt*, *supra*, 13 Cal.4th at p. 935.) In other words, the discussion is relevant to the third prong of the *Covalt* test.

15

Third, in regard to the *Wilson* court's second line of reasoning—the lack of clarity as to whether "best practices" would address stray voltage issues—Edison faults the opinion for "not discuss[ing] whether imposing liability on [Edison] for stray voltage would hinder or interfere with any PUC regulatory policy." Contrary to Edison's position, that is exactly what the *Wilson* court is discussing. The "best practices" discussion is part of a larger discussion regarding General Order 174. (*Wilson*, *supra*, 234 Cal.App.4th at p. 150.) The appellate court was examining whether the requirement that utilities gather to discuss "best practices" as ordered by the PUC would be effected by this stray voltage litigation. The appellate court concluded, "it is unclear whether this 'best practice' will address stray voltage issues." (*Ibid*.) Hence, the appellate court concluded there was nothing indicating the litigation would affect the PUC's policy, because there was nothing indicating a contrary stray voltage policy would be implemented. (*Ibid.*)

Fourth, as to the *Wilson* court's third line of reasoning—that cases where the PUC was found to have exclusive jurisdiction were "of a vastly different character"—Edison asserts, "The decision does not attempt to reconcile this observation with *Covalt*'s statement that the absence of a specific regulation is not dispositive and that [s]ection 1759 prohibits interference even with 'a general supervisory or regulatory policy.'"

Contrary to Edison's position, the opinion addresses this exact point. In *Wilson*, the appellate court wrote, "We disagree with Wilson's assertion that section 1759 applies in this case only if the PUC has issued a specific regulation on stray voltage. In

16

*Covalt*, the Court observed that under the *Waters* rule, section 1759 barred an action for damages 'not only when an award of damages would directly contravene a specific order or decision of the commission . . . *but also when an award of damages would simply have the effect of undermining a general supervisory or regulatory policy of the commission*, i.e., when it would "hinder" or "frustrate" or "interfere with" or "obstruct" that policy.'" (*Wilson*, *supra*, 234 Cal.App.4th at p. 148.) Thus, the *Wilson* court explicitly discussed that the absence of a specific regulation is not dispositive, i.e., the appellate court's discussion is about the PUC's general policies.

In sum, Edison's arguments about *Wilson* being wrongly decided are unpersuasive.

E.      JURISDICTION

1.      *WILSON*

As explained *ante*, in *Wilson*, the plaintiff brought causes of action for (1) negligence; (2) nuisance; and (3) intentional infliction of emotional distress. (*Wilson*, *supra*, 234 Cal.App.4th at p. 129.) In *Wilson*, Wilson complained of "stray voltage generated by the Topaz substation enter[ing] into [her] home, causing shocks to [her], and that Edison knew of the stray voltage from the substation, but failed to properly operate, maintain, or control the substation, and failed to maintain the safety of the residents living next to the substation." Wilson sought to have the stray voltage eliminated on her property. (*Id.* at pp. 139-140.)

17

### 2.    *COMPLAINT*

We now examine the jurisdiction issue in the instant case.  As set forth *ante*, plaintiffs brought causes of action for (1) negligence; (2) nuisance; (3) trespass; (4) strict liability/products liability; (5) strict liability/implied warranty of fitness; (6) strict liability/ultra hazardous activity; and (7) intentional infliction of emotional distress.  Plaintiffs are complaining of stray voltage entering their property from the Indian Wells substation.  Plaintiffs allege they have suffered health issues due to the stray voltage from the substation.

### 3.    *NEGLIGENCE*

In their first cause of action, plaintiffs contend Edison negligently "managed, owned, operated, leased, possessed, secured, designed, modified, installed, constructed, engineered, and controlled the Indian Wells substation," and that it negligently "staff[ed], supervise[d], secure[d], operate[d], or control[led]" the substation.  Plaintiffs also complain Edison negligently provided "repairs, maintenance and customer service," and "fail[ed] to reasonably and/or diligently monitor, test, secure, maintain, inspect, and control the Indian Wells Substation and its electricity emissions."

To the extent all of these actions are focused upon stray voltage, the reasoning of the *Wilson* opinion would support the superior court having jurisdiction over the matter.  Both cases concern injuries resulting from stray voltage emanating from or returning to substations.  Edison has not persuaded us that *Wilson* is incorrect.  Accordingly, since plaintiffs' claims are similar to those in *Wilson*, in that they both concern stray voltage from or returning to substations, we conclude the superior court has jurisdiction over the

18

matter because there is nothing indicating litigation over stray voltage would hinder or interfere with a PUC policy.

    4.     *NUISANCE, TRESPASS, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

In the second cause of action, for nuisance, plaintiffs alleged stray electrical currents from the substation were entering their property, and they have suffered health issues as a result. In the third cause of action, plaintiffs alleged Edison trespassed on their property with stray electrical currents. In the seventh cause of action, plaintiffs asserted that stray electrical currents caused them to suffer distress, discomfort, anxiety, fear, and anguish. These allegations are on-point with the allegations in the *Wilson* case, which also included allegations of nuisance and intentional infliction of emotional distress in relation to stray electrical currents from a substation. (*Wilson*, *supra*, 234 Cal.App.4th at pp. 139-140.) As explained *ante*, we have found nothing indicating the *Wilson* decision is incorrect. Accordingly, the stray voltage litigation will not hinder or interfere with a PUC policy, and, therefore, the superior court has jurisdiction over plaintiffs' case.

    5.     *STRICT LIABILITY—PRODUCTS LIABILITY, IMPLIED WARRANTY OF FITNESS, AND ULTRA HAZARDOUS ACTIVITY*

In the fourth, fifth, and sixth causes of action, plaintiffs present claims that are labeled as "strict liability." Edison does not assert a different jurisdictional analysis would apply to the strict liability causes of action. Accordingly, since the strict liability causes of action are also related to the stray voltage allegations, we conclude, as the

19

appellate court did in *Wilson*, that litigation concerning stray voltage will not hinder or interfere with a PUC policy. (*Wilson*, *supra*, 234 Cal.App.4th at p. 151.)

### 6. *CONCLUSION*

We conclude the superior court has jurisdiction over plaintiffs' claims as they relate to stray electrical currents.

### F. *HARTWELL*

Edison contends the case of *Hartwell Corporation v. Superior Court* (2002) 27 Cal.4th 256 (*Hartwell*), supports the conclusion that the PUC has exclusive jurisdiction over plaintiffs' claims. In *Hartwell*, there were three groups of plaintiffs, one of which included over 100 coplaintiffs. The complaints included causes of action for negligence, strict liability, trespass, public and private nuisance, fraudulent concealment, and wrongful death. (*Id.* at pp. 260-261.) The cases concerned allegations of unsafe drinking water.

In response to the lawsuits filed against the utilities, the PUC filed an order instituting an investigation into the safety of the utilities' drinking water supplies. (*Hartwell*, *supra*, 27 Cal.4th at p. 262.) Due to the PUC's investigation, the utilities argued the superior court lacked jurisdiction over the plaintiffs' claims (§ 1759). (*Hartwell*, at p. 263.) The intermediate court of appeal concluded the superior court lacked jurisdiction over water quality issues involving the regulated utilities, but not over the nonregulated water providers. (*Id.* at p. 264.) One group of plaintiffs appealed. (*Ibid.*)

The Supreme Court concluded the PUC had regulatory authority over water quality issues and that it had exercised its authority over those issues. (*Hartwell*, *supra*, 27 Cal.4th at pp. 272, 274.) As to the third prong of the *Covalt* test, the Supreme Court found a claim for damages based upon water being unsafe, even if it met PUC standards, would hinder or interfere with the PUC's regulatory authority because it "'would plainly undermine the [PUC's] policy,'" by finding the utility at fault for doing all that was required by the PUC. (*Hartwell*, at p. 276.) However, the Supreme Court concluded that damage claims based upon the water failing to meet federal and state drinking water standards would not be preempted. The court reasoned that a jury award based upon a public utility violating standards set by the Department of Health Services (as opposed to the PUC's standard) would not interfere with a PUC policy. (*Id.* at pp. 276-277.)

As explained in *Wilson*, the *Hartwell* type of case is "of a vastly different character" because "the PUC conducted (or was in the process of conducting) investigations into or adopted regulations on the specific issue alleged in the plaintiffs' lawsuit." (*Wilson*, *supra*, 234 Cal.App.4th at p. 150.) In *Hartwell*, the PUC was actively conducting an investigation into the safety of the utilities' drinking water supplies. (*Hartwell*, *supra*, 27 Cal.4th at p. 262.) The investigation was instituted in response to the plaintiffs' lawsuits. (*Ibid.*) The instant case is distinguishable because there is nothing indicating the PUC is investigating the stray voltage issue or has otherwise addressed the stray voltage issue in a manner that would cause the current

21

litigation to interfere with a PUC policy.  Accordingly, we are not persuaded by Edison's reliance on *Hartwell*.

        G.      <u>EMF</u>

        1.     *FAC*

In the FAC, plaintiffs mix allegations related to electric and magnetic fields (EMF) with their stray voltage allegations.  In the first cause of action, for negligence, plaintiffs alleged:  "Plaintiffs had no knowledge, and had no reason to know, of the presence of the stray, uncontrolled electrical currents emitted from the Indian Wells substation, resulting in dangerously high levels of electrical current in the ground which create a further magnetic charge in the immediate surroundings in, about and throughout Plaintiffs' Home, until these issues were brought to their attention by a medical diagnosis of Plaintiff Kathy Seacrist's injuries as possibly stemming from stray current discharge from a neighboring electrical facility."

Plaintiffs also alleged, "Plaintiffs began understanding that the serious safety, health and medical issues they experienced, and continue to experience, were a direct, proximate, and legal result of living in a Home subject to the electrical currents and high levels of magnetic frequency in the air arising therefrom, in and about the Seacrist Home."  Also in the first cause of action, plaintiffs assert, "Defendants knew that there were, and are, excessive electric currents and voltage from the adjacent substation resulting in dangerously high levels of current and magnetic frequency in, about, and throughout the Desert Rose Development."  Plaintiffs further alleged, "Defendants carelessly, recklessly, negligently, and unlawfully failed and refused to eliminate the

22

hazardous conditions and to properly protect and maintain the safety of the Plaintiffs from the foreseeable danger of the excessive electric currents and high levels of magnetic frequency in, around, and throughout their Home."

Other causes of action have a similar mixture of stray voltage and EMF allegations. The second cause of action, for nuisance, reflects, "At all times mentioned herein and relevant hereto, residential properties and homes located adjacent to the Indian Wells Substation, were, and are, subject to entry by stray, uncontrolled electrical currents that are generated, emitted, and traveling from said substation, and there were, and continue to be, excessive electric currents and voltage from said adjacent substation resulting in dangerously high levels of current and magnetic frequency in, about, and throughout adjacent residential properties and homes, including the Home of Plaintiffs."

EMF allegations are expressly mixed into the third cause of action (trespass), the fifth cause of action (strict liability—implied warranty of fitness), the sixth cause of action (strict liability—ultra hazardous activity), and the seventh cause of action (intentional infliction of emotional distress).

### 2. *COVALT*

The *Covalt* case concerned allegations of personal injury caused by EMF resulting from power lines. San Diego Gas & Electric demurred on the ground of lack of jurisdiction because the Covalts' lawsuit "would hinder or frustrate a general regulatory policy of the commission [(the PUC)]." (*Covalt*, *supra*, 13 Cal.4th at pp. 911-912.) The Supreme Court found the PUC exercised its "authority to adopt a policy on power line electric and magnetic fields." (*Id.* at p. 926.) The Supreme Court

23

explained the Legislature had directed the PUC to research and report on health risks "associated with power line electric and magnetic fields." (*Ibid.*) In the report, the PUC discussed "whether statewide regulation of power line electric and magnetic fields would be timely and appropriate." (*Id.* at p. 927.)

The high court noted the PUC also issued a decision addressing "power line electric and magnetic fields." (*Covalt*, *supra*, 13 Cal.4th at p. 928.) In the decision, Edison was granted "a certificate of public convenience and necessity to construct a new 220 kV transmission line 38 miles long between its Kramer and Victor substations in San Bernardino County. In discussing environmental considerations, the [PUC] reiterated that 'studies to date allow one to reach virtually any conclusion as to whether the electromagnetic fields emanating from transmission lines pose hazards to health.'" (*Ibid.*)

Four months after the decision, the PUC reopened and expanded its inquiry into EMF for the purpose of developing "'policies and procedures for addressing the potential health effects of electric and magnetic fields of utility facilities.'" (*Covalt*, *supra*, 13 Cal.4th at 929.) The PUC then appointed an advisory panel to address EMF concerns. (*Ibid.*) The PUC issued an interim order addressing "'electric and magnetic fields (EMF) related to electric utility facilities and power lines.'" (*Id.* at p. 930.) "[T]he commission concluded that 'it is reasonable to establish an EMF policy for electric utility facilities and power lines' [citation], and it proceeded to do so." (*Id.* at p. 931.)

24

In the policy, the PUC (1) ordered utilities to implement steps to reduce or mitigate EMF at "new and upgraded facilities"; (2) expressed interest in creating a record on some issues for the purpose of possibly developing an "'EMF policy for existing facilities'"; (3) ordered a workshop for developing "'design guidelines' to follow in designing and siting new power line facilities, for the purpose of mitigating electric and magnetic fields"; (4) declared the need for a uniform policy on measuring EMF in customers' buildings; (5) created a committee to advise the PUC on EMF; (6) created a coordinated effort to educate people about EMF; and (7) created a research program into EMF. (*Covalt*, *supra*, 13 Cal.4th at pp. 931-934.)

Based upon the foregoing actions, the Supreme Court concluded, "There is no doubt that the [PUC] is still actively pursuing the broad policy inquiry into the potential health effects of power line electric and magnetic fields." (*Covalt*, *supra*, 13 Cal.4th at 934.) As a result, the court determined the Covalts' lawsuit, to the extent it stated sufficient causes of action, would hinder or interfere with that policy. (*Id.* at p. 935.)

3. *ANALYSIS*

Edison asserts that, due to the EMF claims, plaintiffs' case is analogous to *Covalt*. Plaintiffs distinguish their case from *Covalt* by asserting their allegations do not relate to overhead power lines.

In *Covalt*, the court discusses the PUC creating policy for EMF in relation to power lines and in relation to electric utility facilities. Electric utility facilities would arguably be broader than power lines and could include substations. However, the court's jurisdictional conclusion in *Covalt* appears to relate only to power lines. For

25

example, the Supreme Court found the PUC exercised its "authority to adopt a policy on power line electric and magnetic fields." (*Id.* at p. 926.) Because (1) it is unclear if the electric utility facilities discussed in *Covalt* include substations, and (2) the holding of *Covalt* does not extend beyond power lines, we conclude the *Covalt* holding does not extend to EMF generated by stray voltage from substations.

"A demurrer tests 'only the legal sufficiency of the complaint.'" (*Title Inc. Co. v. Comerica Bank—California* (1994) 27 Cal.App.4th 800, 807.) The facts pled by plaintiffs appear to fall outside of *Covalt* because, on the face of the FAC, plaintiffs are complaining about EMF caused by stray voltage from a substation, not EMF generated by power lines.

It is possible that in a summary judgment motion, or at another point in the trial process, evidence will reflect the PUC has jurisdiction over EMF claims related to substations because the PUC has policy on the subject; however, at this point, looking at the face of the FAC, the facts as pled do not fall within *Covalt*. (See *Greener v. Workers' Comp. Appeals Bd.* (1993) 6 Cal.4th 1028, 1036 [a challenge to the court's subject matter jurisdiction is properly brought by demurrer to the complaint, motion to strike, motion for judgment on the pleadings, motion for summary judgment, or in an answer].)

H.    CONCLUSION

The parties agree that the only issue on appeal is whether the PUC has exclusive jurisdiction over plaintiffs' claims.  We conclude the PUC does not have exclusive jurisdiction; the trial court has jurisdiction over the claims raised by plaintiffs.[6]

**DISPOSITION**

The judgment is reversed.  Appellants are awarded their costs on appeal.

CERTIFIED FOR PUBLICATION


MILLER _____
                                                                                             J.


We concur:


McKINSTER _____
            Acting P. J.


KING _____
                    J.

------

[6] Edison requests this court take judicial notice of (1) the Los Angeles County Superior Court's invitation for the PUC to file an amicus brief in a case pending in that county; and (2) a June 2014 amicus brief the PUC filed in Los Angeles County Superior Court, in response to the invitation.  It appears both documents are part of a court record in the Los Angeles County Superior Court.  Accordingly, we grant the request for judicial notice, as required by law.  (Evid. Code, §§ 452, subd. (d), 453.)

27