Filed 12/8/22  In re An.L. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re AN.L. et al., Persons Coming Under the Juvenile Court Law. _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> MARIA D. et al., <br><br> Defendants and Appellants. | B315986 <br><br> (Los Angeles County Super. Ct. No. 20CCJP01456A–B) |

APPEAL from orders of the Superior Court of Los Angeles County, Debra R. Archuleta, Judge.  Affirmed.

Karriem Baker, under appointment by the Court of Appeal, for Defendant and Appellant Maria D.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant Hector L.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

_____

# INTRODUCTION

Maria D. (Mother) and Hector L. (Father) appeal from the juvenile court's summary denial of Father's Welfare and Institutions Code section 388[1] petitions and its order terminating their parental rights to their daughters An.L. and Al.L. They contend the court did not conduct a correct parent-child relationship analysis as set out in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) and erroneously failed to find applicable the beneficial parent-child relationship exception set forth in section 366.26, subdivision (c)(1)(B)(i). The parents also argue the matter should be remanded for further inquiry under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA). We affirm the orders.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Commencement of Dependency Proceedings

When Al.L. tested positive for methamphetamines at birth, the Los Angeles County Department of Children and Family Services (DCFS) filed a petition alleging she and her one-year-old sister An.L. came within the jurisdiction of the juvenile court under section 300, subdivisions (b)(1) (failure to protect) and (j) (abuse of sibling).[2] Initially, the childSren were detained from Mother and released to Father on the condition that they stay

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] The abuse of sibling count and one failure to protect count were based on Mother's prior drug abuse and failure to protect her older children, who received permanent placement services. Father was not the father of those children.

with the paternal grandparents until the results of Father's drug test became available.

When Al.L. was nine days old, Father tested positive for amphetamines and methamphetamines. DCFS immediately removed the children from him. On March 20, 2020, the court detained the children from Father, placed them with the paternal grandparents, and granted the parents monitored visits. DCFS filed an amended petition adding a section 300, subdivision (b)(1) allegation based on Father's drug use. The jurisdictional hearing was set for June 2020.

In May 2020, Father tested positive on one drug test and missed another. Mother, who admitted long term methamphetamine use, tested negative in March, then missed tests in April and May 2020. The parents visited the children daily or every other day, and there were no concerns regarding visits.

On June 29, 2020, the court amended the first amended petition by interlineation and sustained the allegations under section 300, subdivisions (b) and (j).

II.    Dispositional Hearing, July 2020

As of July 2020, both parents were visiting the children three times per week and visits were going well. Mother said she had begun a drug and alcohol program, parenting education, and individual counseling, but she had failed to appear for any scheduled drug tests since May 2020. Between May and July 2020, Father had tested positive once and failed to appear for eight scheduled drug tests. He had not enrolled in any classes.

At disposition, the court declared the children dependents and ordered them removed from their parents. The parents were ordered to complete parenting education, individual counseling,

3

and a minimum of six months of drug and alcohol services, including a full drug/alcohol program with aftercare, testing, and a 12-step program.  The court granted monitored visitation with discretion to DCFS to liberalize.

III.    July 2020–February 2021

The children were placed in foster care in November 2020 because the paternal grandparents were allowing Father unmonitored access to them.

Both parents failed to comply with their case plans. Mother began and quit multiple treatment programs, and she was dismissed from her counseling program for nonattendance. Mother missed all 25 scheduled DCFS drug tests between August 2020 and February 2021.  She admitted using drugs in September 2020, and she tested positive at her program in February 2021.

Father missed all 13 scheduled DCFS drug tests between the disposition hearing and October 2020.  In October 2020 Father enrolled in a substance abuse program, but he missed so many services in the first two months that he was on the verge of discharge.  His case manager told DCFS, "We have achieved nothing."  As of January 5, 2021, Father had not gone to any 12-step meetings.

Between October 2020 and February 3, 2021, Father attended 40 group sessions and 14 individual sessions of his treatment program.  Over the same period, he tested positive on four of the eight drug tests his program administered.  Father enrolled in a weekly parenting class in January 2021.  By February 3, 2021, he had started attending 12-step meetings and had a sponsor.

4

As of September 2020, both parents were visiting the children and there were no concerns about visitation. Once the children were placed in foster care, the parents visited telephonically and by videoconference. During calls, Father talked and engaged with the children.

Father had three 2-hour park visits with the children in January and February 2021. Father arrived on time for the first visit, and the children hugged him. They sat on a blanket and Father fed them. An.L. watched videos on a tablet while Father held Al.L. Toward the end of the visit, Father and An.L. spent time at the playground. At the end of the visit, Father put the children in their car seats.

For their second park visit, Father spread out a blanket, set out toys for the children, and erected a small bouncy house that the children enjoyed. Father was creative at bringing things for the girls to play with. He fed them snacks and took them to the playground. Father was courteous and appropriate at all times.

Father brought a jumper, blanket, toys, and food to the park for his third in-person visit. Father and the children sat together and ate while watching videos. An.L. and Father played peek-a-boo; Al.L. asked Father when she wanted food or toys. The children were comfortable with Father and waved or said goodbye at the end of the visit.

IV.    March–May, 2021

During this period, Mother tested positive for methamphetamines and missed several drug tests. She attended substance abuse classes consistently but not productively. She transferred to a residential treatment program in April but was soon discharged for obtaining drugs. Mother had not enrolled in a new program as of May 20, 2021.

Father was attending his substance abuse program, but he was not always mentally present. Although he was attending 12-step meetings and had a temporary sponsor, it was unclear how many meetings he had attended because he signed his own attendance record. Father reported attending six 12-step meetings in April 2021. Father's monthly drug tests for his program had all been negative; he had missed some DCFS tests and tested negative on others.

V.     Review Hearing

At the review hearing on May 26, 2021, DCFS recommended terminating reunification services. Mother asked for continued services. Father wanted the children returned to him or permanently placed with the paternal grandparents. In the alternative, he sought unmonitored visitation and more reunification services.

According to Father's counsel, Father had completed his substance abuse program and was set to complete aftercare on June 5, 2021. He was attending a 12-step program and was excited about recovery. He had finished parenting education. The only part of the case plan Father had not yet addressed was individual counseling.

The court considered Father's failure to document his 12-step program attendance in May 2021 and his missed drug tests between March and May 2021 to be "a blatant disregard of the court case plan." Finding the parents had not made substantial progress toward alleviating the causes necessitating the children's placement, the court terminated reunification services and set a section 366.26 permanency planning hearing (".26 hearing") for September 2021. The court granted monitored in-

person visits twice weekly for two hours per visit and authorized continued drug testing.

VI.    Permanency Planning Hearing Reports

DCFS advised the court the foster parents were committed to adopting the children, and there appeared to be no impediment to adoption.  The children, aged one and two, were too young to provide statements, but they had adjusted well to the prospective adoptive home and sought age-appropriate attention, love, and care from the prospective adoptive parents.  Neither child exhibited emotional distress or received mental health services.

The parents were warm, engaging, and affectionate with the children during video and in-person visits.  The children recognized their parents and were happy and excited to see them.  Father began visiting regularly in January 2021.  He visited two or three times per month.  In March 2021, he failed to appear for two visits and missed a scheduled video visit.  He visited six times and missed a seventh in July 2021.  Father was appropriate, loving, affectionate, and engaging during visits; he brought food and toys or activities, and he played with them on the playground.  The children were happy and excited to spend time with him.

In the concurrent planning assessment, DCFS stated that the parents visited the children weekly at a park and had telephone or video visits twice per week.  The parents were each described as visiting the children 30 times in the prior six months.

As of September 2021, Mother had missed numerous drug tests and tested positive once.  She claimed to be in treatment but provided no details.  She had visited the children once in June and once in September.

7

Father had tested for DCFS intermittently, sometimes testing negative and other times failing to appear. He had completed parenting class on June 21, 2021. He attended individual therapy three times per month. He had attended one 12-step meeting since April. Father visited the children twice weekly; some visits had been canceled when Father was late.

VII.   Section 388 Petitions

The day before the scheduled .26 hearing, Father filed section 388 petitions asking for the children to be returned to him, or, in the alternative, unmonitored visitation and reinstated reunification services. Father identified as changed circumstances that he had "consistently visited his children. The children are always happy and excited to spend time with him. Father has completed a full drug/alcohol program, completed after care, completed parenting and participates in individual counseling." He asserted the change in orders would be better for the children because he believed it would be in their best interest to have a relationship with him, he loved them, and he was willing to do whatever it took to get them back.

Father attached a July 2021 letter from his treatment program stating he had completed his substance abuse counseling on April 19, 2021, and his aftercare program on July 17, 2021. From October 2020 to July 2021, he had attended 90 virtual groups, 37 telephonic individual counseling sessions, and 28 12-step meetings. He had tested negative for drugs five times in May, June, and July during the aftercare program. He submitted his aftercare completion certificate, documentation that he completed parenting class on June 21, 2021, and a letter stating he was receiving mental health services from a program to which he had been admitted on June 23, 2021.

8

The court postponed the .26 hearing to October 21, 2021 and invited the parties to submit additional materials for the court to consider with respect to the petitions. Father subsequently filed an additional section 388 petition for each child. The petitions' language and the relief sought were unchanged, but Father now provided a declaration and supporting documentation.

Although much of Father's information already had been presented to the court in his earlier petitions, he did provide some new information. Father stated he had "addressed all case issues" in individual counseling. He reported attending his 12-step program at least six times per week and speaking with his sponsor weekly. Father also supplied information about, and photographs of, his housing.

Father said he had maintained consistent, frequent contact with his daughters both in person and virtually. He had visited consistently since January 2021. Father declared he brought toys and snacks to visits and played on the playground with his children. He said the children enjoyed the visits and showed excitement during visits. The children became sad as visits concluded and looked forward to his next visit.

Father declared he loved his children and believed it was in their best interest to return to him. They were bonded, and he had maintained parental responsibility when the children were out of his care. He had complied with all court orders, was committed to sobriety, and had stable housing. Father intended to continue addressing the issues that brought them to court and to ensure the children's safety.

DCFS confirmed Father visited twice per week and had stable housing. DCFS reported Father had failed to appear for

9

drug testing three times since August 21, 2021 and had not provided a sample on two other occasions.

The court summarily denied Father's section 388 petitions, explaining it "didn't find there was a prima facie showing . . . [of] a change of circumstances that would even allow for a hearing."

## VIII.  October 21, 2021

The parents opposed the termination of their parental rights and asserted the beneficial parental relationship exception applied.  Father asked for a contested .26 hearing and requested a bonding study.  DCFS opposed Father's requests because Father did not occupy a parental role with the children.  The children's counsel also opposed a contested hearing.

The court said, "I believe that many of the issues raised by Father's counsel were issues that were addressed in the [section] 388 [petitions], and the court has respectively denied a hearing on that."  The court agreed Father visited the children but said, "[H]e's not played a particularly significant parental role."  The court noted there were "several other issues that Father has to overcome," including his failure to test regularly, but observed that was "a separate issue" from whether he had made a sufficient offer of proof for a contested hearing and whether to order a bonding study.

The court continued the hearing to the following day so Father could testify in person.

## IX.    October 22, 2021

The next day, the court received into evidence the permanency planning report, notices and proofs of service for the hearing, and last minute information reports from September and October 2021.  The court admitted into evidence all but one

10

of Father's exhibits; it excluded Father's October 12, 2021 section 388 petition.

Father testified he had monitored visits twice per week and had been visiting the children in person since January 2021. Prior to that, he had video visits. Father first testified that the children were "sad, serious, in the beginning" of visits. His counsel asked the question again, and Father testified that at the start of visits, the children were "happy at first, screaming, shouting, calling my name, Pop." During visits, Father and the children ate, sang, and played. He tried to teach them numbers, letters, and discipline. With respect to discipline, Father taught "[s]haring, no is no, how to hold a fork," and to "eat and just be serious" while eating. The children grew sad at the end of visits and did not want to leave; they cried, shouted, and reached their hands out to Father. Father first testified this happened "a lot, like most of the time," and then said, "Most of the time from a month, three, four times."

Father testified he had been their primary parental figure before they came to the attention of the court. Father would "feed them, change them, basically be a father figure, sing songs, and put them to sleep." He had taken the children to doctor's appointments three times.

Father chose not to present additional witnesses.

DCFS argued Father had visited regularly since January 2021—but the children had been detained almost a year earlier. Father was appropriate during visits, brought food and toys, and played with the children on the playground, but he had not demonstrated he played a parental role in their lives; the caregiver had been solely responsible for the children's day-to-day care, education, and medical care. DCFS asserted "there would

11

be a detriment as well in returning—because the father has continued to be inconsistent with his testing." DCFS argued Father's inconsistency and failure to demonstrate sobriety were detrimental to the children. DCFS argued Mother continued to test positive, was not visiting the children, and did not occupy a parental role.

There was some confusion at the point of closing argument whether the hearing was a contested .26 hearing or if the court was still considering whether to order a bonding study and set the matter for contest. Father's counsel did not object to treating the hearing as a contested section .26 hearing. Minors' counsel believed the court was still deciding whether to hold a contested hearing. She argued against a contest because, given their extremely young age, "it's [a] virtual logical impossibility that these children would be so bonded with their father, that it would be detrimental for them to terminate that relationship when [Al.L.] has spent half her life with the caregiver, and [An.L.] has been there for a year. I don't believe that there's any evidence or testimony that's been proffered that . . . comes close to meeting an offer of proof for this prong of the analysis." Minors' counsel said she was so confident there was no bond that she would join in the request for a bonding study if a contested hearing were ordered.

The court clarified that the hearing was a contested .26 hearing that had been trailed from the previous day so Father could testify. While it did not remember Father asking for a bonding study, the court said it would give his counsel "an opportunity to make her argument to the court on all of the issues that are currently pending before the court."

Father asked the court to admit his section 388 petition as rebuttal evidence because DCFS's reference to his lack of case plan compliance opened the door. The court refused, but said, "I reviewed all of the reports that have been contained as part of the electronic case file in this matter, all the status review reports, all the last-minute reports. Even though I'm not technically allowing that exhibit in, the court has reviewed all of the documentation that supported your position for the preparation of today's proceeding." The court also said, "The lack of compliance with the case plan, although it's a factor, []is not a barrier in this case."

Father argued against terminating parental rights because the children would benefit from a continued relationship with him and terminating the relationship would be detrimental to them. He had taken advantage of all opportunities to visit them. He was "a constant," his visits had been consistent and regular, he stood in a parental role, and the visits had "continued the significant emotional attachment created with the minors prior to removal." He had taken them to doctors' visits, he sang to them, they cried and reached out to him at the end of visits, and before removal he had been their primary caregiver. He addressed their behavior and instructed them on disciplinary practices, including how to share, hold a fork, and what "no" means.

Father's counsel attempted to argue the children would experience emotional problems in the future if parental rights were terminated, but when the court pointed out she was assuming facts not in evidence, she revised her argument to assert their happiness at the start of visits and unhappiness at the visits' end evidenced "some emotional attachment" and "some

sort of trauma that's occurring" at the close of the visits.  Father asked for a legal guardianship.

The court concluded Father had maintained regular visitation.  However, it did "not find that the children would continue to benefit from that ongoing relationship, and that terminating the relationship would be detrimental to these children."  The court did not "believe that [Father] was able to overcome the statutory requirements that would trigger the exception.  And, therefore, I do not find that the exception applies."  The court found Father had "more of a bond with the children" than Mother did, but "it's still not enough to overcome the burden that Father has in this matter."  The court found any benefit to the children from their relationships with their parents was outweighed by the physical and emotional benefit they would receive through the permanency and stability of adoption.  The court terminated parental rights.

X.     ICWA Inquiry and Findings

Both parents denied knowledge of any Indian ancestry when DCFS inquired before the dependency petition was filed.  At the detention hearing, Mother and Father completed ICWA-020 forms denying Indian ancestry.  The court did not ask either parent if they had Indian ancestry.  Instead, the court said, "[T]he father indicates no Native American ancestry.  The mother indicates none as well.  And, therefore, the court will find no reason to know the case is governed by the Indian Child Welfare Act."  The court did not instruct the parties to inform the court if they subsequently received information providing reason to know the children were Indian children.

In a 2016 proceeding involving Mother's older children, ICWA had been found not to apply to Mother.

## DISCUSSION

I.      Father's Section 388 Petitions

Section 388 is a general provision permitting the court, "upon grounds of change of circumstance or new evidence . . . to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." (§ 388, subd. (a).) The statute is an "escape mechanism" that allows the dependency court to consider new information even after parental reunification efforts have been terminated. (*In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1316.) It permits the modification of a prior order only when the petitioner establishes by a preponderance of the evidence that (1) changed circumstances or new evidence exists; and (2) the proposed change would promote the best interests of the child. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806 (*Zachary G.*).)

A petitioner must make a prima facie showing of changed circumstances and best interests in order to obtain a hearing on a section 388 petition. (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250 (*Anthony W.*); Cal. Rules of Court, rule 5.570(d).) While the petition must be liberally construed in favor of its sufficiency, the allegations must "describe specifically" how the petition will advance the child's best interests. (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1157 (*G.B.*); *Anthony W.*, at p. 250.) "The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*Zachary G.*, *supra*, 77 Cal.App.4th at p. 806.) In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. (*In re R.A.* (2021) 61 Cal.App.5th 826, 837 (*R.A.*).)

15

Abundant authority supports the use of an abuse of discretion standard in reviewing the summary denial of a section 388 petition. (*In re Daniel F.* (2021) 64 Cal.App.5th 701, 711; *R.A.*, *supra*, 61 Cal.App.5th at p. 837; *G.B.*, *supra*, 227 Cal.App.4th at p. 1158; *Anthony W.*, *supra*, 87 Cal.App.4th at p. 250.) However, Father, joined by Mother, argues that when the court denies a section 388 petition without a hearing, the question of whether the petition set forth a prima facie case should be reviewed de novo. It is unnecessary to resolve this issue because under either standard, Father's section 388 petition did not make a prima facie showing for modification of the juvenile court's May 26, 2021 order.

A.     <u>Completion of Treatment and Parenting Education</u>

It is implicit in the language of section 388 that the change of circumstances must have occurred after issuance of the order the petitioner seeks to modify. (*G.B.*, *supra*, 227 Cal.App.4th at p. 1160.) Here, Father alleged as a changed circumstance that he had completed a full drug/alcohol program and a parenting education class. But he had completed his treatment program in April 2021, and his certificate of completion was received into evidence at the May 2021 hearing. As Father completed treatment before reunification services were terminated, this cannot, as a matter of law, constitute a change of circumstances under section 388.

Father also set forth his completion of a parenting education class as a changed circumstance. It appears Father's counsel exaggerated Father's progress in parenting class at the hearing on May 26, 2021. Counsel represented that Father's progress report letter showed he had completed the parenting course, when actually the letter said he had completed 10 of 12

16

sessions. As the court had been given to understand the course was complete in May, Father's completion of the course, whenever it occurred, did not change the circumstances as they had been presented to the court before it ruled. As Father had informed the court he had finished the course before the court terminated his reunification services, this was not a change of circumstances under section 388 as a matter of law.[3]

B.    Aftercare

Father alleged as a changed circumstance that he had completed his aftercare program. During the May 26, 2021 hearing, Father's counsel had advised the court Father was "set to complete" aftercare on June 5, 2021—11 days later. Therefore, the only changed circumstance was that Father completed the program the court had known he was about to complete when it terminated reunification services.[4] While this is *a* change in

---

[3]    The outcome would not change even if we treat Father's completion of his last two sessions of parenting class as a changed circumstance because it is not a significant change. (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615 (*Mickel O.*) [change of circumstances must be of such a significant nature that it requires modification of the prior order].)

[4]    In his October 2021 declaration and on appeal, Father states he completed aftercare on July 17, 2021. The discrepancy between his May representation that he was 11 days from finishing aftercare and his later claim that he did not finish until July 2021 is unexplained, but in any event, when the court terminated reunification services, it did so with the understanding that Father's successful completion of this portion of his case plan was imminent—even if the court had been led to believe it was more imminent than it actually was.

17

circumstances, it is a nominal one. The change in circumstances supporting a section 388 petition must be material. (*In re N.F.* (2021) 68 Cal.App.5th 112, 120.)

C.     Visitation

Father declared he had maintained consistent, frequent contact with his daughters both in person and virtually; he had consistently visited the children since January 2021; and he visited twice weekly for two hours at a time. Father said, "I love the visits with my daughters. During these visits, I bring them toys and snacks, and I play with them on the playground. My daughters also enjoy my visits and show excitement during the visit. I have also noticed the children becoming sad as the visit concludes. They look forward to the next visit that I have with them."

These statements did not constitute a prima facie showing of a material change in circumstances. "A parent establishes a substantial change of circumstances for purposes of section 388 by showing that, during the period between termination of reunification services and the permanency planning hearing, he or she has resolved the previously unresolved issues supporting juvenile court jurisdiction." (*In re J.M.* (2020) 50 Cal.App.5th 833, 846.) Much of this information about Father's visits had been reported to the court before it terminated reunification services. In any event, the unresolved issues supporting juvenile court jurisdiction bore no relation to the frequency, length, or quality of Father's visitation; they related to Father's substance abuse problems and failure to protect his children.

D.    Individual Counseling

Father claimed as a changed circumstance that he had enrolled in individual counseling.  He declared he had "addressed all case issues" in therapy, but he did not specify the topics covered in treatment, describe his progress, or set forth the number of sessions he had attended.  Similarly, Father's supporting letter from the service provider merely stated he "receives mental health services" at the facility, but not the nature of the services, the number of sessions attended, or the topics addressed; nor did it include a professional evaluation indicating Father had addressed case issues in counseling or made progress on the issues that had led to the dependency.

Father was required to show changed, not changing, circumstances, and, more fundamentally, "[t]he change of circumstances or new evidence 'must be of such significant nature that it requires a setting aside or modification of the challenged prior order.' " (*Mickel O.*, *supra*, 197 Cal.App.4th at p. 615.) Father's belated start of counseling is at best a changing circumstance; his bare bones showing did not demonstrate a significant change of circumstances that would require setting aside the court's order or returning the children to him.

Whether considered de novo or as a matter within the discretion of the juvenile court, we conclude Father did not make a prima facie showing for modification of the May 26, 2021 order. The court properly denied the petition without an evidentiary hearing.[5]

_____

[5]    Because we have concluded the court properly denied the section 388 petition without a hearing, we necessarily reject his contention that his constitutional due process rights were

II.     Termination of Parental Rights

Father, joined by Mother, argues the .26 hearing was not conducted in compliance with *Caden C.* and it was error to terminate parental rights because Father had regularly visited the children, the children would benefit from continuing the relationship, and terminating the relationship would be detrimental to them.  (§ 366.26, subd. (c)(1)(B)(i).)  It appears the court failed to properly evaluate whether the children had a substantial, positive emotional relationship with Father, but the error was harmless because Father did not offer evidence that termination of the relationship would be detrimental to the children.

A.     Applicable Law and Standard of Review

"To guide the court in selecting the most suitable permanent arrangement" for a dependent child who cannot be returned to a parent's care, section 366.26 "lists plans in order of preference and provides a detailed procedure for choosing among them." (*Caden C.*, *supra*, 11 Cal.5th at p. 630; see § 366.26, subd. (b).)  At the permanency planning hearing, if the court finds that the child "is likely to be adopted" and that "there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption." (*Caden C.*, at p. 630; see § 366.26, subd. (c)(1).)  "But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another

---

violated by the summary denial of his petition.  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306–310.)

20

permanent plan." (*Caden C.*, at pp. 630–631; see § 366.26, subd. (c)(1)(B)(i)-(vi), (4)(A).)

One of the exceptions, the beneficial parental relationship exception, applies when (1) "the parent has regularly visited with the child," (2) "the child would benefit from continuing the relationship," and (3) "terminating the relationship would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 629; see § 366.26, subd. (c)(1)(B)(i).) "The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C.*, at p. 632.)

To establish the second element, that the child would benefit from continuing the parental relationship, the parent must show the child has a "substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) The "focus is the child," and "the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Id.* at p. 632.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) "When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s). . . . Accordingly, courts should not look to

21

whether the parent can provide a home for the child." (*Id.* at p. 634.) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id.* at pp. 633–634.)

The parent has the burden to show the statutory exception applies. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826.) When a parent meets that burden, the beneficial parental relationship exception applies such that it would not be in the best interest of the child to terminate parental rights. In that case the court must select a permanent plan other than adoption. (*Caden C.*, *supra*, 11 Cal.5th at pp. 636–637.)

We review the juvenile court's findings using a hybrid approach: for the first two elements, which require factual findings (parental visitation and the child's emotional attachment), we apply the substantial evidence standard of review; and for the court's weighing of the relative harms and benefits of terminating parental rights, we use the abuse of discretion standard. (*Caden C., supra*, 11 Cal.5th at pp. 639–640.)

B.      The Juvenile Court Failed to Properly Analyze the Second Element of the *Caden C.* Analysis

The first element of the exception, regular visitation, is not in dispute. The court found, and it was agreed by all parties, that Father had maintained regular visitation and contact with the children.

On the second element, whether the child would benefit from continuing the relationship, "it is critical for the juvenile court at the second step of the analysis to consider the evidence

22

showing whether the parent's actions or inactions 'continued or developed a significant, positive, emotional attachment from child to parent.' " (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230.) It does not appear the court properly examined the nature of the parent-child relationship to evaluate whether a significant positive emotional attachment existed between Father and the children. Father presented evidence that his children, although very young, were attached to him. The children were removed when An.L. was a year old and Al.L. was about a week old. Father testified he was their primary parental figure before they came to the attention of the court. Father would "feed them, change them, basically be a father figure, sing songs, and put them to sleep." At visits, the children were "happy at first, screaming, shouting, calling my name, Pop." They ate, sang, and played. Father tried to teach them numbers, letters, and discipline. With respect to discipline, Father taught "[s]haring, no is no, how to hold a fork," and that they should be serious while eating. At the end of visits, the children were sad and did not want to leave. They reached out to Father, crying and shouting.

The evidence of how the children responded to Father during visits was relevant to whether, and to what extent, the children had a significant emotional attachment to him. "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) But instead of examining Father's evidence of the children's responses to him to assess the " 'positive' or 'negative' effect of interaction between parent and child" (*Ibid.*), the court dismissed out of hand the children's happiness at seeing Father and their unhappiness when the visits ended as something to be

expected "when you have very young children who see[] him for limited periods of time[] a couple of times a week."

Questions of Father's parental role and day-to-day care for the children played a problematic part in the .26 hearing. DCFS argued the beneficial parental relationship exception requires a parent to play a parental role, and that "the latest report makes [it] clear that it is the caregiver that has been providing all this to the minors and not the father." DCFS also argued that "[s]ince the children have been with the caregiver, the caregiver has been solely responsible for the day-to-day care of the children," their education, and their medical care. The court agreed Father had not played a particularly significant parental role. But "[i]t is unnecessary to show that the parent occupies a parental role in the child's life because a child can have a psychologically or emotionally significant relationship with the parents even if they do not occupy a parental role." (*In re M.G.* (2022) 80 Cal.App.5th 836, 848 (*M.G.*).)

Ultimately, the court scrutinized Father more than it evaluated the children's attachment to him. It justified its conclusion that Father had not "developed that type of relationship" with the children necessary for the exception to apply by pointing directly to Father's lack of day-to-day care for the children and the limited amount of time he was able to spend with them: "I do not see the father has developed that type of relationship with these very young children, other than having some visitation, teaching them how to share, essentially, and trying to use a fork. [¶] As [DCFS counsel] asked, he's taken one of the children to the doctor three times. Physical care for infants is much more than taking children or babies to the doctor, the pediatrician. I know he provides snacks at some of the visits.

24

But comfort, affection, and stimulation is much more than two hours a week, twice a week."

"[I]t is not necessary—even if it were possible—to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) While day-to-day contact is typical in a parent-child relationship, it is not required for a significant emotional attachment to exist. (*In re L.A.-O.* (2021) 73 Cal.App.5th 197, 209.) Nor does the fact that the caregiver provided day-to-day care for the children preclude them from having a substantial, positive emotional attachment with Father. A parent does not have to prove a child's attachment to that parent is their primary bond. (*In re J.D.* (2021) 70 Cal.App.5th 833, 859 (*J.D.*).) The exception can apply when a child has bonded to an alternative caretaker. (*Ibid.*) "The focus, again, is on the child. That a child may have more than one person who stands in the role of parents does not defeat the exception; a strong relationship with one parental figure does not negate the harm the child would experience if the child were to lose a significant and positive relationship with the parents." (*M.G.*, *supra*, 80 Cal.App.5th at p. 848.)

Additionally, although the court stated that Father's failure to comply with the case plan was not a categorical bar to finding a parent-child bond (*Caden C.*, *supra*, 11 Cal.5th at p. 637), it repeatedly mentioned his noncompliance with the case plan during the hearing and expressly identified it as a factor in making its decision. DCFS argued Father's inconsistency in testing and his failure to demonstrate sobriety were detrimental to the children. However, a "parent's struggles with issues such

25

as those that led to dependency are relevant only to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it?" (*Id.* at p. 638.)

It is not clear whether the court considered Father's failure to test regularly and document his sobriety in a permissible manner. The record suggests the court may have thought of Father's noncompliance as an independent consideration in determining whether the beneficial parental relationship exception applied. Early in the proceedings, when discussing whether a contested hearing was appropriate, the court described Father's "multiple no-shows and failures to test for the department" as one of the "issues that Father has to overcome." But case plan noncompliance is not something parents must overcome to establish their children's significant, positive, emotional attachment to them. "Parents need not show that they are 'actively involved in maintaining their sobriety or complying substantially with their case plan.' " (*Caden C.*, *supra,* 11 Cal.5th at p. 637.)

By discounting Father's evidence and treating the existence of a beneficial parental relationship as a matter of physical day-to-day care, time spent together, and, possibly, case plan compliance, the court did not truly consider the attachment between Father and his children. "*Caden C.* made clear the beneficial relationship exception is *not* focused on a parent's ability to care for a child or some narrow view of what a parent-child relationship should look like. [Citation.] Instead, the focus is whether there is a substantial, positive emotional attachment between the parent and child." (*In re D.M.* (2021) 71 Cal.App.5th 261, 270 (*D.M.*).)

## C.  The Error Was Harmless

The apparent inconsistency between *Caden C.* and the court's evaluation of the children's relationship with Father was harmless.  Father presented almost no evidence that terminating his relationship with the children, however positive it might be, would be detrimental.  (See *In re J.R.* (2022) 82 Cal.App.5th 526, 533 [when "the proper legal standard is already established and a party has had a full and fair opportunity to present all of their evidence on a contested issue, and yet in the end there is simply no evidence that could support a favorable finding for them, then any legal error in the court's reasoning or basis for its decision quite obviously is harmless"].)

Father's argument that it would be detrimental to the children to terminate his parental rights was that the children's unhappiness at the end of visits showed "there is some sort of trauma that's occurring" when visits concluded.  But there was no evidence the children's unhappiness at the end of their visits signified they were traumatized by parting from Father.  Although Father had the opportunity to call witnesses and offer evidence, he did not present any evidence that the children experienced anything more serious than toddlers' vehement but transitory discontent at the conclusion of a happy visit with Father at the park.  Other evidence showed the children were neither exhibiting emotional distress nor receiving mental health services.  They were not having problems adjusting to their placement, and they were able to seek age-appropriate attention, love, and care from their caregivers.  While it is undoubtedly difficult for children as young as these to express emotional attachment and desires, and it was undisputed that the children enjoyed the visits, the evidence did not show that ending the

27

visits would cause them detriment.  (Cf. *D.M.*, *supra*, 71 Cal.App.5th at p. 271 [children had lived with their father for two to eight years, wanted to return to him, and cried when visits with him concluded]; *J.D.*, *supra*, 70 Cal.App.5th at pp. 857–858 [child frequently expressed a desire to go to his mother's house, told her he loved her, sought her attention during visits, and shared intimate moments and exchanges with her].)  On this record, any error in the court's ruling on the second step of the *Caden C.* analysis was harmless.

D.     Bonding Study

Father argues the termination of parental rights should be reversed because the court did not order a bonding study.  The California Supreme Court has instructed juvenile courts to "seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony." (*Caden C.*, *supra*, 11 Cal.5th at p. 633, fn. 4.)  But "[t]here is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to" terminating parental rights.  (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339 (*Lorenzo C.*).)

Bonding studies supply expert opinion about the psychological importance to the child of the relationship with his or her parent(s) to assist the court in determining whether "the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i); see *Caden C.*, *supra*, 11 Cal.5th at pp. 632–633.) They are particularly informative in cases like *Caden C.*, in which the child was eight or nine years old and had a complex parental relationship with both positive and negative aspects. (*Caden C.*, at pp. 626–627, 634–635.)  Here, however, Father did not demonstrate, nor does the record supply any reason to

28

believe, that expert opinion would have been a valuable contribution in determining the psychological importance of the parental relationship to the children, ages 19 months and 34 months, who had been removed from Father when they were nine days old and 15 months old, respectively; had been living with the prospective adoptive parents for 11 months; had positive visits with Father; did not exhibit emotional distress or adjustment problems; and did not have identified needs that would bear upon their parental relationship. (See *Caden C.*, at p. 632 [relevant factors in assessing attachment include the age of the child, the portion of the child's life spent in the parent's custody, the positive or negative effect of interaction between parent and child, and the child's particular needs].)

Finally, Father did not seek a bonding study until the day of the permanency planning hearing. "Bonding studies after the termination of reunification services would frequently require delays in permanency planning." (*In re Richard C.* (1998) 68 Cal.App.4th 1191, 1197.) Requests to acquire additional evidence in support of a parent's claim of the beneficial parental relationship could be asserted in nearly every dependency proceeding where the parent has maintained contact with the child, but "[t]he Legislature did not contemplate such last-minute efforts to put off permanent placement." (*Ibid.*) "While it is not beyond the juvenile court's discretion to order a bonding study late in the process under compelling circumstances, the denial of a belated request for such a study is fully consistent with the scheme of the dependency statutes." (*Ibid.*) The court did not abuse its discretion when it did not order a bonding study. (*Lorenzo C.*, *supra*, 54 Cal.App.4th at p. 1341.)

29

Father raises a series of arguments to support his claim the court erred by denying his request for a bonding study. First, Father asserts the court terminated parental rights without a bonding study "based on the highly inflammatory and prejudicial statement by minors' counsel that due to the minors' ages, it was a 'virtual logical impossibility' that they would be so bonded with the father that it would be detrimental to terminate their relationship with him." We are mystified by this argument. Minors' counsel made the statement to which Father refers while arguing Father had not made an adequate offer of proof to warrant a contested .26 hearing. Father does not identify any evidence in the record to support his claim that the court's decision to terminate parental rights without a bonding study was based on minors' counsel's argument against a contested hearing. This is fatal to his argument. (*In re S.C.* (2006) 138 Cal.App.4th 396, 408 (*S.C.*) ["To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error"].) Additionally, minors' counsel was arguing against holding a contested .26 hearing. If the court had adopted counsel's view and made its decisions "based" on her argument, presumably it would not have held a contested hearing at all.

Father claims there was "abundant, uncontroverted evidence of a bond between the father and the minors," but this conclusory assertion does not demonstrate any abuse of discretion in failing to order a bonding study. He alleges "the idea that young children cannot have an important bonded relationship with a parent needed, at the very least, to be tested with a bonding expert," but he has not shown the court believed young children incapable of meaningful bonding with a parent.

Moreover, bonding studies are not ordered to determine broad issues about bonding capabilities of young children in general; they are ordered, when appropriate, to provide information about the psychological importance of a particular parental relationship for the particular child. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

Next, Father states that "expert literature on the internet or otherwise" discusses the "critical importance of early bonding with a parent." This unspecified expert "internet or otherwise" literature is not in the record. (*In re K.M.* (2015) 242 Cal.App.4th 450, 455–456 [normally when reviewing the correctness of a judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered].) Father asserts he presented "uncontroverted evidence of strong bonding and parental interaction with the minors," and he quotes DCFS's positive description of his visits. Again, these assertions do not establish that a bonding study was appropriate or necessary, or that it was an abuse of discretion to refuse a request made the day of the .26 hearing.

Father also claims the decision in *In re Scott B.* (2010) 188 Cal.App.4th 452 required the court to order a bonding study. In *Scott B.*, the relationship between the mother and child, coupled with the child's emotional instability and his expressed desire to live with his mother, "present[ed] a compelling reason for finding that termination of parental rights [wa]s detrimental to the minor." (*Id.* at p. 471.) Father argues the "significance" of *Scott B.* is "that the importance of an informed opinion by a person in the field cannot and should not be undermined." He posits a bonding study would have provided the same kind of information that a court appointed special advocate provided in *Scott B.*, and asserts that under that case, it was error to

31

terminate parental rights without a study. This argument, devoid of citation to any language in the *Scott B.* opinion, is meritless. That decision did not discuss bonding studies or undermining people in the field, and its holding does not suggest, let alone demonstrate, error. Cases are not authority for propositions not considered. (*B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 11.)

III.  ICWA

The parents contend remand is necessary because the juvenile court failed to comply with ICWA. ICWA reflects a congressional determination to protect American Indian children and to promote the stability and security of Indian tribes and families. (25 U.S.C. § 1902; *In re Josiah T.* (2021) 71 Cal.App.5th 388, 401 (*Josiah T.*).) To that end, ICWA established unique standards for the removal and placement of American Indian children. (25 U.S.C. § 1901 et seq.) Central to the protections of ICWA are procedural rules to determine whether an Indian child is involved. Federal regulations implementing ICWA require state courts to ask participants in child custody proceedings whether the participant knows or has reason to know the child is an Indian child. (25 C.F.R. § 23.107(a) (2022); *Josiah T.*, at pp. 401–402.)

The juvenile court has "an affirmative and continuing duty to inquire" whether a child subject to a section 300 petition may be an Indian child. (§ 224.2, subd. (a); *Josiah T., supra,* 71 Cal.App.5th at p. 402.) State law lays out the requirements for the initial inquiry. (*Josiah T.*, at p. 402.) DCFS must ask "the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or

32

may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) At each participant's first appearance at dependency proceedings, the court must ask whether the participant knows or has reason to know the child is an Indian child. (*Id.*, subd. (c).) Also at that first appearance, the court "shall instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (*Ibid.*)

Both DCFS and the juvenile court failed to comply with their ICWA obligations. DCFS failed in its duty of initial inquiry because it conducted no investigation beyond asking the parents if they had Indian ancestry. Multiple extended family members were known to and/or in contact with DCFS from the earliest days of the investigation, but there is no indication DCFS asked any of them about possible Indian ancestry. DCFS's failure to ask the children's extended relatives about their possible Indian ancestry violated the express mandate of section 224.2, subdivision (b).[6]

The juvenile court also failed to comply with section 224.2, subdivision (c). When Mother and Father made their first appearances, the court did not ask them if they knew or had reason to know that the child is an Indian child. The court merely recited, presumably based on the forms filed that day, that the parents had indicated no Native American ancestry, so the court had no reason to know that ICWA applied. The court

---

[6] Mother and Father did sign ICWA-020 forms denying knowledge of any Indian ancestry, but parents' statements on "ICWA-020 forms d[o] not relieve the Department of its duty to interview the parents' extended relatives." (*In re J.C.* (2022) 77 Cal.App.5th 70, 81.)

did not instruct the parties to inform the court if they subsequently received information providing reason to know the child is an Indian child,[7] meaning the legal mechanism to ensure the court would be notified if the parents later learned new ICWA information was never put in place.

As a result of these omissions, the initial inquiry was defective and violated California law.  However, on the record presented here, the error was harmless.[8]  Where the parents were raised by their biological relatives and the record suggests no reason to believe that the parents' knowledge of their own heritage is incorrect or that the children may have Indian heritage, no prejudice arises from DCFS's failure to conduct a complete inquiry.  (*In re J.W.* (2022) 81 Cal.App.5th 384, 391.)  Father was raised by his parents and Mother by her mother, and there is no indication in the record that these were not biological parents.  Nothing in the record suggests the parents' denial of Indian heritage was incorrect, uninformed, or unfounded.  Nor does the record otherwise reflect a reason to believe the children were Indian children.

---

[7]     The minute orders from the hearing do say the parents were told to keep DCFS, their counsel, and the court informed of new ICWA information, but the oral record of the detention hearing includes no such instruction.  The record of the court's oral pronouncement controls over the clerk's minute order.  (*People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2.)

[8]     The appropriate standard of review for a defective initial inquiry is presently pending before the California Supreme Court in *In re Dezi* C. (2022) 79 Cal.App.5th 769, review granted September 21, 2022, S275578.

IV.    Briefing by Father's Appellate Counsel

We regret that it is necessary to address problems of incivility and lack of candor in Father's briefing.

A.    Impugning the Integrity of the Juvenile Court

Attorneys have a duty to "maintain the respect due to the courts of justice and judicial officers."  (Bus. & Prof. Code, § 6068, subd. (b).)  " '[I]t is vital to the integrity of our adversary legal process that attorneys strive to maintain the highest standards of ethics, civility, and professionalism in the practice of law.' " (*S.C.*, *supra*, 138 Cal.App.4th at p. 412.)

In the opening brief, Father's appellate counsel alleged the juvenile court failed to fulfill its duty to impartially judge the matters presented to the court and deliberately compromised Father's rights in order to reach a predetermined result.  Father's appellate counsel wrote, "It was error not to order a bonding study in this case and the failure and refusal to do so, is part of the *stonewalling* that this family experienced herein, in favor of a *predetermined agenda* of adoption."  (Italics added.)  Father's appellate counsel again impugned the integrity of the juvenile court at the conclusion of the brief when she alleged it refused to hear the section 388 petitions, denied the bonding study request, barred Father from presenting evidence of his case plan compliance while allowing other parties to submit evidence and argue regarding the case plan, and "*misapplied the case law in a prejudicial attempt* to justify termination of [Father's] parental rights" despite the evidence that the beneficial parental relationship applied.  (Italics added.)

Father's appellate counsel did not identify any evidence in the record to substantiate her sweeping allegations against the

juvenile court, nor did we find any support for them in our review of the record.  With these contemptuous statements, counsel's language "lurched off the path of discourse and into the ditch of abuse." (*In re Mahoney* (2021) 65 Cal.App.5th 376, 381 (*Mahoney*).)  When made without evidentiary support, accusations that a judicial officer intentionally refused to follow and apply the law constitute reportable misconduct.  (*Martinez v. O'Hara* (2019) 32 Cal.App.5th 853, 857–858.)

We agree with the Fourth District Court of Appeal, Division Three, which recently urged, "This kind of over-the-top, anything-goes, devil-take-the-hindmost rhetoric has to stop. [¶] If you think the court is wrong, don't hesitate to say so.  Explain the error.  Analyze the cases the court relied upon and delineate its mistake.  Do so forcefully.  Do so *con brio*; do so with zeal, with passion.  We in the appellate courts will respect your efforts and understand your ardor.  Sometimes we will agree with you." (*Mahoney*, *supra*, 65 Cal.App.5th at p. 380.)  The court continued, "But don't expect to get anywhere—except the reported decisions—with jeremiads about . . . courts whose decisions are based not on a reading of the law but on their general corruption . . . ."[9]  (*Ibid*.)  The same holds true for tirades alleging a court has prejudged matters, stonewalled a party, inequitably denied a party the opportunity to present evidence, and deliberately misapplied the law to justify a predetermined outcome.

---

[9]     In *Mahoney*, the court was addressing language directed at the Court of Appeal rather than at a trial court, but the court's words are equally applicable here.

36

### B. Disregard for the Duty of Candor

"The duty of candor requires attorneys to use 'those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law.'" (*Roche v. Hyde* (2020) 51 Cal.App.5th 757, 817.) We are dismayed by assertions made by Father's appellate counsel that at best are disingenuous and at worst are efforts to mislead this court.

Father's hyperbolic accusation that the juvenile court denied him the opportunity to "defend his sobriety" while permitting the other parties to argue his lack of case plan compliance is a good example. The record shows the court ruled one exhibit, Father's denied section 388 petition, inadmissible. The court did not preclude Father from offering evidence on case plan compliance or sobriety; it simply said some of the petition was not relevant or admissible at the .26 hearing, noted that Father was going to testify, and concluded it was appropriate to exclude the exhibit. Far from refusing to "permit the father's evidence on his sobriety," when it ruled, the court told Father's counsel, "And of course, Ms. Smith, since he's going to testify, you may make inquiry as well." We find it telling that Father's appellate counsel did not argue the court erred in its evidentiary ruling; instead she mischaracterized the ruling and ignored the record to claim again that Father was subjected to "stonewalling . . . throughout the proceedings below."

Father's appellate counsel also claimed in the opening brief that the court "terminate[d] parental rights without a bonding study based on" an argument made by the children's counsel. Father's appellate counsel neither identified any support in the record for her contention that the argument made by the

37

children's counsel was the basis for the court's ruling, nor did she disclose that the argument was made by children's counsel on a separate issue. "Professional ethics and considerations of credibility in advocacy require that appellants support their arguments with fair and accurate representations of trial court proceedings. (Cal. Rules of Court, rule 8.204(a)(2); Rules of Prof. Conduct, rule 5–200.)" (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 745.)

Other statements by Father's appellate counsel stretched the record and credulity to their breaking points. Father's counsel asserted, without a citation to supporting evidence, that "[F]ather had a lifelong relationship with the minors as their primary caregiver." Certainly, Father testified he was the children's primary parental figure prior to the family coming to the attention of the court, and Father's appellate counsel's representation is arguably reasonable as to An.L., who was not removed from Father until she was 15 months old. But the record showed that Al.L. was released to Father when she left the hospital at three days old—and only on the condition that she stay with the paternal grandparents until Father's drug test results came back. Father tested positive for drugs six days later, at which time Al.L. was removed from Father's custody and was never returned. Characterizing Father as having a "lifelong relationship" as the "primary caregiver" with a child who was never allowed to stay with him and who was removed from his custody at nine days old is not consistent with counsel's duty of candor.

We remind Father's appellate counsel of her duties as an attorney to "maintain the respect due to the courts of justice and judicial officers," and to "employ, for the purpose of maintaining

38

the causes confided to him or her those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law." (Bus. & Prof. Code, § 6068, subds. (b) & (d).) We will forward a copy of this opinion to the California Appellate Project—which oversees the work of appointed appellate counsel—for whatever action it deems appropriate.

## DISPOSITION

The orders denying Father's section 388 petitions and terminating parental rights are affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

STRATTON, P. J.

We concur:

GRIMES, J.

HARUTUNIAN, J.*

---

\* Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.